1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


CITIZENS FOR BETTER FORESTRY, et al.,

        Plaintiffs,                        No. C 05-1144 PJH

    v.

U.S. DEPT. OF AGRICULTURE,  et al.,

        Defendants,

        and

AMERICAN FOREST & PAPER ASSN.,
et al.,

        Defendants-Intervenors.
_____/

DEFENDERS OF WILDLIFE, et al.,

        Plaintiffs,

        and

PEOPLE OF THE STATE OF CALIFORNIA,

        Plaintiff-Intervenor,

                             No. C 04-4512 PJH

    v.                                **ORDER GRANTING IN PART**
                                     **AND DENYING IN PART**
MIKE JOHANNS, Secretary, United States    **PLAINTIFFS' MOTION FOR**
Department of Agriculture, in his official     **SUMMARY JUDGMENT; AND**
capacity, et al.,                           **GRANTING IN PART AND**
                                     **DENYING IN PART**
        Defendants,                     **DEFENDANTS' MOTION**
                                     **FOR SUMMARY JUDGMENT**
        and

AMERICAN FOREST & PAPER ASSN.,
et al.,

        Defendants-Intervenors.
_____/

1    The parties' cross-motions for summary judgment in these two environmental cases

2    came on for hearing before the court on November 1, 2006.  The court had previously

3    decided two motions for summary judgment and/or for judgment on the pleadings.

4    Because of the overlap in the facts, administrative records, and claims, the court ordered

5    consolidated summary judgment briefing and argument on the remaining claims.

6    For the reasons that follow, the court GRANTS IN PART AND DENIES IN PART

7    plaintiffs' motion for summary judgment and GRANTS IN PART AND DENIES IN PART

8    defendants' motion for summary judgment.

9                                    **PROCEDURAL BACKGROUND**

10   Defenders of Wildlife, Sierra Club, The Wilderness Society, and the Vermont Natural

11   Resources Council (collectively "Defenders" plaintiffs) are non-profit environmental and

12   conservation organizations headquartered throughout the United States.  Defenders filed

13   their case, 04-4512 PJH, on October 26, 2004, asserting five claims for relief under the

14   Administrative Procedure Act ("APA"), 5 U.S.C. § 553, the National Forest Management Act

15   of 1976 ("NFMA"), 16 U.S.C. § 1600 et seq., and the National Environmental Policy Act

16   ("NEPA"), 42 U.S.C. § 4231 et seq., against defendants Mike Johanns, the Secretary of the

17   United States Department of Agriculture ("USDA"), Dale Bosworth, the Chief of the United

18   States Forest Service, and the United States Forest Service, an agency within the USDA.

19   Defenders plaintiffs filed a supplemental complaint on February 17, 2005.

20   Defendants American Forest & Paper Association and American Forest Resource Council

21   (collectively "defendant-intervenors") intervened on May 23, 2005.  On October 14, 2005,

22   this court granted in part and denied in part Defenders defendants' motion for partial

23   summary judgment and/or for judgment on the pleadings as to three of the five claims in

24   04-4512 PJH.  The court denied summary judgment as to two of the claims, and granted it

25   as to one.  Thus, following the motion, four claims remained.  Subsequently, on October

26   17, 2005, the State of California intervened in the Defenders case, and filed a complaint

27   stating two claims (which overlap with surviving claims in both the Defenders and Citizens

28   cases).

1    Plaintiffs Citizens for Better Forestry, Environmental Protection Information Center,

2  Center for Biological Diversity, the Ecology Center, Gifford Pinchot Task Force, Kettle

3  Range Conservation Group, Idaho Sporting Congress, Friends of the Clearwater, Utah

4  Environmental Congress, Cascadia Wildlands Project, Klamath Siskiyou Wildlands Center,

5  Southern Appalachian Biodiversity Project, Headwaters, the Lands Council, and Oregon

6  Natural Resources Council Fund (collectively "Citizens" plaintiffs) are also non-profit

7  environmental and conservation organizations headquartered throughout the United States.

8    They filed their complaint in case number 05-1144 on March 21, 2005, and a

9  supplemental complaint on November 7, 2005 (following this court's summary judgment

10  order in the Defenders case), alleging ten claims under NEPA, the APA, and the

11  Endangered Species Act ("ESA") against defendants USDA and the Forest Service.

12  Defendants American Forest & Paper Association and American Forest Resource Council

13  intervened in the Citizens case as well.  On April 21, 2006, the court granted Citizens

14  defendants' motion for partial summary judgment and/or judgment on the pleadings, and

15  dismissed six of the ten claims in the Citizens case.  Accordingly, there are also four

16  remaining claims in the Citizens case.

17    Because the Citizens and Defenders cases were both assigned to the undersigned

18  judge, the cases were never formally related or consolidated.  However, because of the

19  overlapping nature of the eight surviving claims in the two cases, on May 10, 2006, the

20  court ordered consolidated briefing on the final summary judgment motions as to the

21  remaining claims.  Thus, when the court refers to "plaintiffs" and defendants" in this order, it

22  is referring collectively to the plaintiffs and defendants in both cases.  Additionally, on

23  November 21, 2006, after the hearing on the motions, the court ordered supplemental

24  consolidated briefing on the NEPA and ESA claims, which was completed on December

25  19, 2006.

26                                   **CLAIMS/ISSUES**

27    In their cross-motions for summary judgment, the parties consolidated the surviving

28  claims in the two cases and presented five issues for the court's resolution:

(1) Whether the USDA violated NEPA in failing to analyze the environmental effects of the decision to replace existing NFMA regulations with the 2005 Rule and categorically excluding the 2005 Rule from NEPA;

(2) Whether the USDA violated ESA by failing to consult with expert agencies regarding the potential impacts of the 2005 Rule on threatened and endangered species;

(3) Whether the USDA violated the APA by failing to provide sufficient public notice and opportunity for comment on the 2005 Rule;

(4) Whether the USDA violated the APA by failing to provide public notice and allow public comment on the 2004 Interpretive Rule; and

(5) Assuming there is a violation of one of the statutes, what is the appropriate remedy or relief?

**FACTUAL BACKGROUND**

**A.     The National Forest System and the NFMA**

The National Forest System (also referred to as "NFS"), which at 192 million acres comprises approximately eight percent of the United States landscape, includes 155 national forests and 22 national grasslands.  *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729 (1998).  The National Forest System is administered by the Forest Service (also referred to as "FS"), an agency of the USDA.

 In 1976, Congress enacted the National Forest Management Act of 1976 ("NFMA") to reform Forest Service management of the National Forest System.  The NFMA requires the Secretary of Agriculture to develop land and resource management plans for units of the National Forest System.  16 U.S.C. § 1604(a).  When the Secretary develops these plans, the NFMA requires him to comply with NEPA, which in turn encompasses a duty to prepare environmental impact statements ("EIS").  *See* 16 U.S.C. § 1604(g)(1).

The NFMA envisions a two-stage approach to forest planning.  *Inland Empire Pub. Lands v. United States Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996) (citing *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1511 (9th Cir. 1992)); *Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998).  First, the NFMA requires the Forest Service to develop a comprehensive forest plan ("forest plan"), which may also be referred to as a Land Resource Management Plan ("LRMP"), and as mentioned above, an EIS for the entire forest.  *Id;* 36 C.F.R. § 219(a),(b).  The forest

1  plan establishes basic guidelines and sets forth the planning elements that will be

2  employed by the Forest Service in future actions in that forest.  *See Sierra Club v.*

3  *Robertson*, 28 F.3d 753, 755 (8th Cir. 1994).  "Once the [Forest Plan] is approved, direct

4  implementation of the LRMP occurs at a second stage, when individual site-specific

5  projects are proposed and assessed."  *Inland Empire*, 88 F.3d at 757.  A site-specific

6  project or decision "must be consistent with the LRMP for the larger area."  *Neighbors*, 137

7  F.3d at 1376-77.

8  The NFMA also imposes substantive requirements on the Forest Service at both

9  stages.  *See* 16 U.S.C. § 1604(g)(3).  These requirements have been promulgated as

10  regulations.  *See* 36 C.F.R. §§ 219, et seq.  Among the NFMA's substantive requirements

11  is the duty to provide for the diversity of plant and animal communities.  *See* 16 U.S.C. §

12  1604(g)(3)(B).

13  **B.     The 1982 Rule (also referred to as 1982 Planning Regulations)**

14  In 1982, the USDA promulgated regulations to protect wildlife and fish, soils, water,

15  outdoor recreation, and other public resources.  The 1982 Planning Regulations included a

16  species viability provision, which provided that "[f]ish and wildlife habitat shall be managed

17  to maintain viable populations of existing native and desired non-native vertebrate species

18  in the planning area."  *See* 36 C.F.R. § 219.19(a)(1) & (6) (1982).  To implement or

19  facilitate this provision, the 1982 Planning Regulations required the Forest Service to select

20  certain wildlife species to be monitored as proxies for the health of broader wildlife

21  populations of the specific ecosystems.  These proxy species are referred

22  to as "management indicator species" or "MIS."  *Id.* at § 219.19(a)(1).

23  **C.     The 2000 Rule  (also referred to as 2000 Planning Regulations)**

24  Several attempts were made to revise the 1982 Planning Regulations prior to 2000.

25  In 1998, a Committee of Scientists convened meetings across the country regarding such

26  revisions, and invited public participation.  In 1999, the Committee provided

27  recommendations to the USDA.  Subsequently, on November 9, 2000, the USDA adopted

28  a final rule revising provisions for managing wildlife and other resources in the national

1   forests.  The 2000 Planning Regulations had thus been open to public notice and comment

2   for a period of several years.

3          The 2000 Planning Regulations were intended to "simplify, clarify, and otherwise

4   improve the planning process; to reduce burdensome and costly procedural requirements;

5   to strengthen and clarify the role of science in planning, and to strengthen collaborative

6   relationships with the public and other government entities."  65 Fed.Reg. 67514, 67514.  In

7   issuing the 2000 Rule, the USDA noted that "[m]any things ha[d] changed since the

8   publication of the 1982 rule," including an increased understanding of concepts such as

9   "sustainability and ecosystem management."  *Id.* at 67516.  Additionally, since 1982, "[t]he

10  Forest Service has . . . gained a great deal of experience developing, implementing,

11  amending, and revising the existing 127 land and resource management plans under the

12  rule."  *Id.*  Accordingly, the 2000 Rule embodied a number of changes to the 1982 Rule,

13  including changes to species viability requirements, the role of science in the planning

14  process, and in the framework for forest planning.  65 Fed. Reg. 67579; 36 C.F.R. § 219.35

15  (2000).

16         The 2000 Rule also included a transition provision, which is at issue in these

17  motions.  *See* 36 C.F.R. § 219.35. The dispute primarily concerns whether the transition

18  provision provided that the 1982 Planning Regulations would remain in effect for site-

19  specific plans until the 2000 Planning Regulations became effective.  Previously, at least

20  with respect to the prior motions in these cases, the parties appeared to agree that

21  pursuant to the transition provision, the 1982 Planning Regulations were to continue to

22  govern site-specific Forest Service decisions until November 9, 2003.  However, that no

23  longer appears to be the case.  The parties now disagree as to whether the transition

24  provision required application of the 1982 Planning Regulations to site-specific decisions

25  during the transition period.  This issue is discussed in greater detail in conjunction with the

26  pertinent APA claim.

27         Subsequently, in 2001, the USDA determined that the Forest Service was not

28  sufficiently prepared to implement the 2000 Planning Regulations, proposed a new

    rulemaking, and postponed the effective date of the 2000 Planning Regulations until May

2002.  *See* 66 Fed. Reg. 27552.  Thereafter, on May 20, 2002, the USDA again extended

the transition date of the 2000 Planning Regulations, and published an "interim final rule"

that provided that until revised planning regulations were promulgated, Forest Service

officials could continue to amend or revise forest plans pursuant to the 1982 Planning

Regulations if they chose to do so, instead of the 2000 Planning Regulations.  67 Fed. Reg.

35431-34.

**D.     The 2002 Proposed Rule (also referred to as the "2002 Rule")**

On December 6, 2002, the USDA published the 2002 Proposed Rule, which differed

from the 2000 Planning Regulations.  67 Fed.Reg. 72770.  In issuing the 2002 Rule, the

USDA attempted to redress perceived inadequacies of the 2000 Rule.  It concluded that

"[a]lthough the 2000 rule was intended to simplify and streamline the development and

amendment of land and resource management plans, . . . the 2000 rule is neither

straightforward nor easy to implement," and it "did not clarify the programmatic nature of

land and resource management planning."  *Id.* at 72770.  The USDA asserted that the

purpose of the 2002 Rule was "to improve upon the 2000 Rule by providing a planning

process which is more readily understood, is within the agency's capability to implement, is

within the anticipated budgets and staffing levels, and recognizes the programmatic nature

of planning."  *Id.*  The agency noted that while the 2002 Rule "retain[ed] many of the basic

concepts in the 2000 rule, namely sustainability, public involvement and collaboration, use

of science, and monitoring and evaluation," the 2002 Rule "attempted to substantially

improve these aspects of the 2000 Rule by eliminating unnecessary procedural detail,

clarifying intended results, and streamlining procedural requirements."  *Id.* at 72772.

Public comment on the 2002 Proposed Rule was open until April 7, 2003. On

September 10, 2003, the USDA published another "interim final rule," again extending the

transition date of the 2000 Planning Regulations.  68 Fed. Reg. 53294. This interim rule

noted that while it was anticipated that the 2002 Rule would be promulgated by the end of

2003, that the promulgation might not occur prior to the expiration of the prior interim rule,

and therefore, provided that, for site-specific decisions, the effective date of the 2000

Planning Regulations was "extended from November 9, 2003, *until the Department*

1    *promulgates the final planning regulations published as proposed December 6, 2002.*"  68

2    Fed. Reg. 53297 (emphasis added).

3    **E.      The 2004 Interpretive Rule**

4            While the USDA was still in the process of reviewing the 2002 Proposed Rule, the

5    department asserted that "considerable uncertainty" had arisen regarding the effect of the

6    2000 Planning Regulations and its transition provision.  On September 29, 2004, the USDA

7    issued an "interpretive rule" that provided that the 1982 Planning Regulations were no

8    longer in effect.  69 Fed. Reg. 58057.  The 2004 Interpretive Rule provided in pertinent

9    part:

10           The transition provisions as originally enacted, and now twice amended,
             explicitly refer to the 1982 planning rule as the rule "in effect prior to
11           November 9, 2000."  At the same time, given the extension of the effective
             date of paragraph (d), within which site-specific decisions must comply with
12           the 2000 planning rule (68 FR 53294), it is clear that site-specific decisions
             entered into during the transition period are not to comply with the substantive
13           provisions of the 2000 planning rule.  This interpretive rule clarifies that until a
             new final rule is promulgated, the transition provision of the 2000 planning
14           rule, as amended by the May 2002 interim final rule remain in effect, *including
             the requirement of § 219.35 paragraph (a) of the transition provisions that
15           responsible officials consider the best available science in implementing
             national forest land management plans and, as appropriate, plan
16           amendments.*  Pursuant to paragraph (b), the provisions of the 1982 planning
             rule may continue to be used only for plan amendments and revisions upon
17           election of the responsible official.  *Appropriate plan amendments and
             projects proposed during the transition period should be developed
18           considering the best available science in accordance with § 219.35 paragraph
             (a).*

19   69 Fed. Reg. at 58056 (emphasis added).

20           On October 26, 2004, shortly after publication of the 2004 Interpretive Rule,

21   Defenders plaintiffs filed their complaint.

22   **F.      The 2005 Rule (also referred to as 2005 Planning Regulations)**

23           Subsequently, on January 5, 2005, the USDA published the 2005 Rule, which it

24   asserted was the result of the public comments received through April 7, 2003, to the 2002

25   Rule.  70 Fed. Reg. 1023.

26           By the USDA's admission, the 2005 Rule "embodies a paradigm shift in land

27   management planning."  70 Fed. Reg. at 1024.  The nature and scope of the changes

28   effected by the 2005 Rule are at issue in most of the claims discussed below.  Defendants

1   characterize the rule as "carr[ying] forward the major themes" contemplated in the 2002

2   Proposed Rule insofar as the plans under the rule "will be more strategic and less

3   prescriptive in nature." *Id.* at 1023.  Plaintiffs, however, claim that the 2005 Rule

4   constitutes a significant departure from prior rules.  Plaintiffs take particular issue with the

5   rule's elimination of species viability and diversity requirements, the increased discretion on

6   the part of local agency officials, and the new role that science plays in agency decisions.

7   The parties' specific arguments regarding the changes are set forth in greater detail below.

8        Unlike prior rules, the 2005 Rule was not open to any additional public notice and/or

9   comment.  Moreover, unlike prior rules, the 2005 Rule was issued without the preparation

10  of an environmental impact statement or environmental analysis under NEPA, and

11  additionally, without the preparation of a similar type of assessment under ESA, after the

12  agency concluded that neither was required.

13       In concluding that NEPA analysis was not required, the USDA determined that the

14  2005 Rule would "not have environmental effects" because it simply "provide[d] a starting

15  point for project and activity NEPA analysis."  70 Fed. Reg. at 1031.  The agency

16  concluded that the 2005 Rule was strategic rather than prescriptive in nature, and implied

17  that because the plans under the 2005 Rule were "strategic and aspirational in nature and

18  generally will not include decisions with on-the-ground effects that can be meaningfully

19  evaluated," the rule did not require NEPA consultation.  *Id.* at 1031-32.  The agency further

20  determined that "the decision to adopt, amend, or revise a plan, . . . is typically not the point

21  in the decisionmaking process. . . likely to have a significant effect on the human

22  environment."  *Id.*

23       Additionally, at the same time the agency published the 2005 Rule, it also issued

24  another new rule that categorically excluded from NEPA's procedural requirements, all

25  proposals to develop, amend, or revise land use plans which did not approve particular

26  projects or site-specific activities.  70 Fed. Reg. 1032, 1062; *see also* Daniel R. Mandelker,

27  NEPA Law and Litigation, § 7:10 (2006 Suppl.).  The USDA noted that this represented a

28  shift from its prior approach to NEPA compliance, *see* 70 Fed. Reg. at 1032, but concluded

    that the proposed exclusion "clarified that plan development, plan amendment, or plan

1   revisions, . . . do not significantly affect the environment, and thus are categorically

2   excluded from further NEPA analysis, unless extraordinary circumstances are present." *Id.*

3   at 1033.  The agency observed that it had "c[o]me to understand" that the approach of

4   preparing EAs and EISs in conjunction with planning rules was both "impractical" and

5   "inefficient" and that "environmental effects of projects and activities cannot be meaningfully

6   evaluated without knowledge of the specific timing and location of the projects and

7   activities."  70 Fed. Reg. at 1062.  Unlike the 2005 Rule itself, the agency opened up the

8   new categorical exclusion, or CE, to public notice and comment until March 7, 2005.  It is

9   unclear when the CE became effective; however, it is now contained in the Forest Service

10  Handbook ("FSH"), at § 31.2(16).  *See* February 15, 2007 FSH.[1]

11          In addition to concluding that the 2005 Rule was not likely to have a significant effect

12  on the environment, the agency also determined that the rule fell within a categorical

13  exclusion such that it did not require NEPA analysis or an impact statement.  Specifically,

14  the agency determined that it satisfied an earlier categorical exclusion set forth in the 2004

15  FSH, at § 31.12, which excluded from EA or EIS documentation requirements, "rules,

16  regulations, or policies to establish Service-wide administrative procedures, program

17  processes, or instruction."  70 Fed. Reg. at 1053-54.  The agency concluded that the 2005

18  "rule clearly falls within this category of actions and the Department has determined that no

19  extraordinary circumstances exist that would require preparation of an EA or an EIS."  *Id.* at

20  1054.

21          The court notes, though, that it does *not* appear that the agency was relying on the

22  new CE described above, which was simultaneously issued with the 2005 Rule.  Although

23  the court was unable to determine the precise effective date of that new CE, it could not

24  have been invoked by the agency for the 2005 Rule because public notice and comment on

25  that CE was still pending at the time the 2005 Rule became effective.  Moreover, the new

26  CE is *not* contained in the section of the FSH actually relied on by the agency, § 31.12, in

27  support of its actions.

28  ───────────────

          [1]This CE, however, is not contained in the 2004 version of the FSH, provided to the
court by the parties.  *See* Pl. RJN at Exh. 4.

1    As noted, the USDA also concluded that neither consultation nor an assessment of

2  the rule's impact on endangered or threatened species was required pursuant to ESA.  *See*

3  Fed. Reg. at 1035.  In determining that consultation was not necessary, the agency

4  reasoned that the 2005 Rule "simply establishes a process for planning," and "is not an

5  action having a direct effect on threatened or endangered species."  *Id.*

6    The USDA nevertheless apparently undertook some type of outside review in

7  making this determination, although the extent of review and the identity of the reviewer are

8  not clear from the record.  *See* Huber Decl., Exh. 1.  In a June 17, 2004 memorandum to

9  the USDA, George C. Iverson (connection unknown), who appears to be a private

10  consultant, noted that the agency sought outside review and advice regarding ESA

11  compliance.  Mr. Iverson concluded that based on his review of the draft final rule, the 2005

12  Rule "will have no effect to threatened, endangered, or proposed species or to designated

13  or proposed critical habitat."  *Id.*  Specifically, Mr. Iverson found:

14

15    It is clear that the draft final rule, in itself, does not predetermine management
   activities for specific project areas or land management plan decisions, nor
16   does it authorize, fund, or carry out any habitat or resource disturbing
   activities.  It does not make any land use allocations, nor does it establish
   specific standards or guidelines for management of resources.  The final rule,
17   being strictly a procedural document, will not directly result in changes in the
   management of any particular National Forest or Grassland or in the activities
18   permitted or conducted on those lands.  Moreover, because of the procedural
   nature of the draft final rule, there is no reasonable basis for assessing or
19   quantifying the specific effects of any subsequent actions, as such effects will
   depend upon decisions made during future programmatic and project
20   planning and it is premature to speculate on the specific nature or effects of
   those decisions.

21
 *Id.*
22
## DISCUSSION
23
**A.    Legal Standards**
24
**1.    Motions for Summary Judgment**
25
26    Summary judgment is appropriate when there is no genuine issue as to material

27  facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

28  Material facts are those that might affect the outcome of the case.  *Anderson v. Liberty*

 *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

1   is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

2   An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that

3   is "merely colorable" or that is "not significantly probative."  *Id.* at 249-50.  The court may

4   not weigh the evidence, and is required to view the evidence in the light most favorable to

5   the nonmoving party.  *Id.* at 248.

6          A party seeking summary judgment bears the initial burden of informing the court of

7   the basis for its motion, and of identifying those portions of the pleadings and discovery

8   responses that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*

9   *v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

10  at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

11  than for the moving party.  On an issue where the nonmoving party will bear the burden of

12  proof at trial, the moving party can prevail merely by pointing out to the district court that

13  there is an absence of evidence to support the nonmoving party's case.  *Id.*  If the moving

14  party meets its initial burden, the opposing party must then set forth specific facts showing

15  that there is some genuine issue for trial in order to defeat the motion.  *Anderson*, 477 U.S.

16  at 250.

17          **2.      Actions under the Administrative Procedure Act**

18         The general review provisions of the APA, 5 U.S.C. §§ 701, et seq., apply in cases

19  asserting violations of the NFMA, ESA, and NEPA.  *Native Ecosystems Council v.*

20  *Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002); *Hells Canyon Alliance v. United States Forest*

21  *Serv.*, 227 F.3d 1170, 1176-77 (9th Cir. 2000); *Neighbors of Cuddy Mountain v. Alexander*,

22  303 F.3d 1059, 1067 (9th Cir. 2002); *Ecology Center v. United States Forest Serv.*, 192

23  F.3d 922, 924-25 (9th Cir. 1999).  In fact, "[t]here is no right to seek judicial review under

24  the Administrative Procedure Act in the absence of a relevant statute whose violation forms

25  the legal basis of the complaint against the governmental action."  Wright & Miller, 14A Fed.

26  Prac. & Proc., Juris.3d § 3659 (2006).  Arbitrary and capricious review cannot be

27  conducted under the APA independent of another statute.  *Oregon Natural Res. Council v.*

28  *Thomas*, 92 F.3d 792, 797 (9th Cir. 1996).

1    Under the APA, "[a] person suffering a legal wrong because of agency action, or

2    adversely affected or aggrieved by agency action within the meaning of a particular statute,

3    is entitled to judicial review thereof." 5 U.S.C. § 702.  Agency action includes the "whole or

4    part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or

5    failure to act." 5 U.S.C. § 551(13).  The APA applies except to the extent that a statute

6    precludes judicial review, or agency action is committed to agency discretion by law.  5

7    U.S.C. § 701(a).

8    An agency action may be set aside under the APA only if it was "arbitrary,

9    capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §

10   706(2)(A); *see Morongo Band of Mission Indians v. Fed. Aviation Admin*, 161 F.3d 569, 573

11   (9th Cir. 1998).  The APA limits judicial review to review of "final" agency action.  *See* 5

12   U.S.C. § 704.  For an action to be "final" under the APA, it should mark the conclusion of an

13   agency's decision-making process, and should also be an action by which rights or

14   obligations have been determined or from which legal conclusions flow.  *Bennett v. Spear*,

15   520 U.S. 154, 177 (1997).

16   **B.    Parties' Motions**

17   The issues raised by these motions have been extensively briefed by the parties.  In

18   addition to the voluminous papers submitted in conjunction with the instant motions, as

19   noted, the court also determined that supplemental briefing was necessary.  However, the

20   supplemental briefing provided little of the guidance sought by the court both because the

21   parties have chosen to frame the issues according to their own self-interest and because

22   the answers are not apparent.  In addition to a review of the materials and arguments

23   submitted by the parties, the court has undertaken its own extensive review of the law,

24   including the statutes and regulations, pertinent secondary authorities, and Ninth Circuit

25   cases.  The court has reviewed several dozen Ninth Circuit cases in order to compare the

26   underlying regulation or agency actions challenged, the procedures followed by the

27   agencies, and the environmental consequences of the challenged actions.

28   This review has confirmed the court's conclusion that these cases present very

difficult questions.  None of the existing Ninth Circuit cases are, factually, entirely on point

1   with this case, which involves a challenge to the enactment of a broad, nationwide

2   programmatic environmental rule.  Nevertheless, there are a number of controlling Ninth

3   Circuit cases that involve smaller scale programmatic and/or policy actions, which the court

4   has looked to for guidance in resolving the issues presented.  Additionally, the court has

5   also found guidance in the relevant statutes and their purposes generally, and also in the

6   procedural protections afforded by the statutes.  Because these cases and authority are

7   primarily relevant to the ESA and NEPA claims, the court discusses this authority in

8   conjunction with those claims.

9       The court begins with two of the five issues, for which the answers were clear - the

10  APA claims.

11      **1.      USDA's Promulgation of the 2005 Rule Violated the APA**

12          **a.      Scope of the APA Claim**

13      It is necessary to revisit an issue that this court dealt with previously in the last round

14  of summary judgment motions.  Previously, plaintiffs alleged in two separate claims that the

15  2005 Rule violated the APA.  In one of the claims, plaintiffs contended that the 2005 Rule

16  differed substantially from the 2002 Proposed Rule, for which public comment was sought,

17  and that it was promulgated without observance of the procedure required by the APA, and

18  was, therefore, arbitrary, capricious, and an abuse of discretion.

19      In the other claim, plaintiffs contended that the 2005 Rule violated the APA because

20  it abandoned the previous resource standards and species viability requirements contained

21  in the 2002 Proposed Rule in favor of an "ecosystem diversity" without a substantial basis

22  in the record for doing so.   *See* 36 C.F.R. § 219.10(b) (2005 Planning Regulations).[1]

23      The court dismissed the claim that the 2005 Rule differed substantially from the

24  2002 Proposed Rule as unripe.  In doing so, the court determined that it was a substantive

25  claim – in other words, it challenged the *substance* of the 2005 Rule insofar as it differed

26  _____

27          [1]The allegedly abandoned standards included: Standards to Provide for the Diversity
    of Plant and Animal Communities; Standards Re: Timber Harvest; Clear-cutting Standards;
28  Forest Plan Consistency Requirement; Public Participation Requirement; implementing and
    monitoring species viability.  *See* 36 C.F.R. § 219.19 (1982 Planning Regulations); 36 C.F.R.
    § 219.20 (b)(2) (2000 Planning Regulations).

1   from prior rules and regulations.  Because it presented a *substantive* as opposed to

2   *procedural* challenge to the 2005 Rule, the court noted that it was not ripe because

3   plaintiffs were not challenging a site-specific project.  *See, e.g., Inland Empire*, 88 F.3d at

4   759; *see also Neighbors of Cuddy Mountains*, 303 F.3d at 1071 n.6; *Idaho Sporting*

5   *Congress v. Rittenhouse*, 305 F.3d 957, 961 (9th Cir. 2002); *Laub v. United States Dep't of*

6   *Interior*, 342 F.3d 1080, 1090 (9th Cir. 2003) (citing *Kern v. BLM*, 284 F.3d 1062, 1070-71

7   (9th Cir. 2002)) ("recogniz[ing] the distinction between *substantive challenges* which are not

8   ripe *until site-specific plans are formulated*, and *procedural challenges* which are ripe for

9   review" *at the time of violation*") (emphasis added); *see also Ohio Forestry Ass'n*, 523 U.S.

10  at 733.[2]

11       However, the court concluded that the latter claim was ripe because it was simply a

12  procedural claim in which plaintiffs asserted that the record defendants compiled in support

13  of the 2005 Rule was insubstantial and therefore insufficient under the APA.   In other

14  words, plaintiffs alleged a procedural injury based on the agency's failure to compile a

15  sufficient record prior to amending and/or rescinding prior species viability and resource

16  standards.

17       In their opening papers on the current summary judgment motions, defendants

18  argue that with respect to the APA claim, plaintiffs improperly rely in part on their

19  substantive NFMA claim(s) that the court already held were not ripe.  They assert that

20  plaintiffs have intertwined their dismissed substantive NFMA claim(s) with their procedural

21  APA claim(s).

22

23  _____

24       [2]In so holding, the court noted that plaintiffs argued that the claim was a procedural
    claim, contending that the USDA did not follow NFMA procedures in promulgating the 2005
25  Planning Regulations.  However, review of the plaintiffs' complaint clearly suggested the
    contrary.   Plaintiffs contended that the 2005 Planning Regulations unlawfully omitted or
26  changed prior planning regulations interpreting the NFMA, and that in doing so, defendants
    violated the APA.   Plaintiffs' argument was essentially that because some of the planning
27  regulations changed by or omitted from the 2005 Planning Regulations themselves provided
    procedural directives, claim two should be read to assert a procedural injury.   Regardless of
28  how plaintiffs characterized it, the court held that claim two challenged the *substance* of the
    2005 Planning Regulations – insofar as the 2005 Planning Regulations differ from prior
    Planning Regulations.  *See, e.g., Inland Empire*, 88 F.3d at 759; *see also Neighbors of Cuddy*
    *Mountains*, 303 F.3d at 1071 n.6; *Idaho Sporting Congress*, 305 F.3d at 961.

1    Plaintiffs counter that they are not arguing the dismissed claims.  They note that

2  defendants did not challenge in prior motions another one of their asserted claims – their

3  claim that the agency violated the APA's notice and comment proceedings by deleting the

4  NFMA-required resource protection standards in the 2005 Rule without allowing public

5  comment.  They assert that resolution of the instant APA claim does not require resolution

6  of the dismissed substantive NFMA claims, and that "[t]he issue before the court is whether

7  the 2005 Rule's elimination of resource protection standards contained in the 2002

8  Proposed Rule was a significant departure from the proposed rule *requiring new APA*

9  *notice and comment."*  Plaintiffs note that the NFMA provisions requiring resource

10 protection standards will be relevant.  In reply, defendants again assert that "[p]laintiffs' true

11 complaint continues to be that the NFMA requires detailed rules on certain subjects in the

12 2005 Rule."  They argue that "[t]he court has dismissed plaintiffs' substantive claims for

13 sound jurisdictional reasons, and plaintiffs' attempt to circumvent this ruling should not be

14 condoned."

15    Having reviewed the arguments and the relevant law, the court finds that the

16 plaintiffs' arguments regarding this claim are proper, and that they do not attempt to revive

17 the dismissed claim.  Instead, the pertinent legal standards require plaintiffs to compare

18 and contrast the 2005 Rule with prior rules in analyzing whether the 2005 Rule was a

19 "logical outgrowth" of prior rules.

20    The court is mindful of the fact that plaintiffs cannot allege a substantive claim - that

21 is, one that challenges the substance of the 2005 Rule – because, under Ninth Circuit law,

22 such a claim is not ripe until there is a challenge to a site-specific project.  Therefore, any of

23 plaintiffs' arguments that challenge the substance of the 2005 Rule were disposed of in this

24 court's prior orders.  Accordingly, the court limits its review to plaintiffs' procedural

25 arguments *only*.  However, that review does appropriately require some comparison of the

26 2005 Rule with prior rules to determine if it is a significant departure or a logical outgrowth

27 of rules for which proper notice was given.

28

1    In conclusion, the court considers whether the 2005 Rule violates the APA because

2  the agency failed to provide adequate notice and to permit public comment on it, and

3  because the agency did not compile a sufficient evidentiary record.

4                    **b.    Legal Standards**

5    In a procedural challenge under the APA, the court "determine[s] in the first instance

6  the adequacy of the agency's notice and comment procedure, without deferring to the

7  agency's own opinion of the adequacy of the notice and comment opportunities it

8  provided."  *National Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002) ("NRDC

9  II").  "A decision made without adequate notice and comment is arbitrary or an abuse of

10 discretion."  *Id.*

11   Before promulgating rules, an agency "must provide notice sufficient to fairly apprise

12 interested persons of the subjects and issues before the agency."  *Id.* (citing *National Res.*

13 *Def. Council v. EPA,* 863 F.2d 1420, 1429 (9th Cir. 1988) ("NRDC I")).  Agencies do,

14 however, have authority to promulgate final rules that differ from the proposed rule on

15 which the public was invited to comment.  *See NRDC I*, 863 F.2d at 1429.  "Indeed, it is the

16 expectation that the final rules will be somewhat different and improved from the rules

17 originally proposed by the agency," and "every alteration in a proposed rule [need not] be

18 reissued for notice and comment."  *NRDC II*, 279 F.3d at 1186.

19   However, "a final rule which departs from a proposed rule must be a logical

20 outgrowth of the proposed rule."  *Id.*  "The essential inquiry focuses on whether interested

21 parties reasonably could have anticipated the final rulemaking from the [proposed rule]."

22 *Id.*  "In determining this, one of the salient questions is whether a new round of notice and

23 comment would provide the first opportunity for interested parties to offer comments that

24 could persuade the agency to modify its rule."  *Id.*  "[W]here . . . the proposal makes no

25 mention of an important component of the final rule enacted, the final rule is not the 'logical

26 outgrowth' of the proposal."  *Earth Island Inst. v. Pengilly*, 376 F.Supp.2d 994, 1011 (E.D.

27 Cal. 2005).  In other words, where an agency's change in position from a proposed rule is

28 "not foreshadowed in proposals and comments advanced during the rulemaking," it will not

be considered a "logical outgrowth" because it may catch interested parties by surprise.

1  *See NRDC II*, 279 F.3d at 1188.  Additionally, where the final rule constitutes a

2  "fundamental policy shift" as opposed to "a natural drafting evolution," it is not a "logical

3  outgrowth."  *Id.*

4          An agency's "duty to identify and make available technical studies and data that it

5  has employed in reaching the decisions to propose particular rules" is integral to its notice

6  requirement.  *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006).  "An

7  agency commits serious procedural error when it fails to reveal portions of the technical

8  basis for a proposed rule in time to allow for meaningful commentary."  *Id.*  However,

9  "nothing prohibits an agency from adding supporting documentation for a final rule in

10 response to public comments."  *Id.*

11         The Ninth Circuit has noted that "[a]fter publishing a proposed rule, agencies often

12 receive new information, which in turn improves the accuracy of agency action."  *Id.*  It

13 further noted that:

14         It is perfectly predictable that new data will come in during the comment
           period, either submitted by the public with comments or collected by the
15         agency in a continuing effort to give the regulations a more accurate
           foundation.  The agency should be encouraged to use such information in its
16         final calculations without thereby risking the requirement of a new comment
           period.
17
18 *Id.*  "Accordingly, the public is not entitled to review and comment on every piece of

19 information utilized during the rulemaking."  *Id.*  "Instead, an agency, without reopening the

20 comment period, may use 'supplementary data, unavailable during the notice and comment

21 period, that expands on and confirms information contained in the proposed rulemaking

22 and addresses alleged deficiencies in the pre-existing data, so long as no prejudice is

23 shown.'"  *Id.* (citing *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1402 (9th Cir.

24 1995)).

                        **c.      Parties' Arguments**

25         Plaintiffs argue that the USDA performed a "bait and switch" with the 2005 Rule.

26 They contend that because the 2005 Rule differed so substantially, in fact constituted a

27 "paradigm shift" from the 2002 Rule, that a new notice and public comment period was

28 required.  They argue that the numerous changes from the 2002 Rule to the 2005 Rule

were not "logical outgrowths" and were not foreseeable by the public.   Specifically,

plaintiffs take issue with the 2005 Rule's elimination of resource protection standards, its

creation of an "environmental management system" or "EMS," and its addition of a

provision regarding the alteration of forest plans.

As for the resource standards, plaintiffs assert that the 2005 Rule not only eliminated

certain NFMA and other standards from the 2002 Rule, but also omitted any reference to

the word "standard."   Plaintiffs offer several examples of resource standards that were

eliminated from the 2005 Rule, including:

- the identification of lands not suitable for commercial logging and the standards by which such identification could be made.   *Cf.* Proposed Rule, 67 Fed. Reg. at 72802; 2005 Rule, 70 Fed. Reg. at 1037, 1057, 1059;

- limitations on clearcutting and other logging methods and related standards.   *Cf.* Proposed Rule, 67 Fed. Reg. at 72796; 2005 Rule, 70 Fed. Reg. at 1059;

- NFMA-required standards regarding the diversity of plant and animal communities.[3]   *Cf.* Proposed Rule 67 Fed. Reg. at 72784 & 72800-802; 2005 Rule, 70 Fed. Reg. at 1059, 1046.

Plaintiffs especially take issue with the changes to the diversity standards.   They

note that there was extensive public comment on the pertinent provisions of the 2002 Rule.

They further note that the proposed diversity provisions were so controversial that in 2003,

the USDA held a workshop solely on those provisions.   Plaintiffs contend that the 2005

Rule's diversity provision is "an affront to every member of the public who took the time to

review the [proposed rule] and provide thoughtful comments."   They argue that there was

no way that the public could have anticipated the changes reflected by the 2005 Rule.

Plaintiffs also contend that the 2005 Rule's adoption of the EMS was unforeseeable.

According to plaintiffs, under the 2005 Rule, an EMS is "each national forest's . . .

centerpiece of the planning process, requiring future forest plans, plan revisions, and plan

amendments to be completed in accordance with [it]."   *See* 36 C.F.R. § 219.5(a).   They

note that the term did not even appear in the 2002 Rule.

---

[3]Plaintiffs describe the related options provided by the proposed rule in detail at pages 29-30 of their opening brief.

1    In support of their argument that the EMS was novel to the 2005 Rule, plaintiffs cite to a

2    briefing paper in which the USDA noted that "[s]o far as we know, . . . no federal or state

3    agency has applied EMS to land management activities.  In private industry, we are aware

4    of several forest products companies who use EMS for their woodland operations."  AR

5    C1423 at 6-7; 14-15.  Plaintiffs argue that, contrary to what they anticipate to be

6    defendants' argument, the EMS provisions were not added to address public comments.

7         Plaintiffs further argue that the 2005 Rule's provision regarding the alteration of

8    forest plans was unforeseeable based on the 2002 Rule.  *Cf.* 2005 Rule, 36 C.F.R. §

9    219.7(b)(3)(4); 2002 Rule, 70 Fed. Reg. at 1043.  They note that this, too, is a significant

10   change because "[t]he amount of logging allowed under a forest plan is a critical part of that

11   plan."  According to plaintiffs, the 2005 Rule is unprecedented in that, unlike the 2002 Rule,

12   it allows the logging level set in the forest plan to be changed at the local responsible

13   official's discretion at any time and does not require a plan amendment or revision.  *See* 36

14   C.F.R. § 219.7(b)(4).  They also contend that the 2005 Rule allows the prior monitoring

15   program to be altered ministerially; whereas, under the 2002 Rule, the program was to be

16   developed with public participation.

17        Defendants respond that the 2005 Rule did not substantially differ from the 2002

18   Rule, and that the public had notice of the changes made to the 2005 Rule.

19   Defendants do not specifically address plaintiffs' arguments regarding the resource

20   standards.  They do, however, address the specific arguments regarding the EMS and the

21   alteration of the forest plans.

22        Defendants argue that "the final 2005 Rule did not add anything new, but reduced

23   complexity from the [2002 Rule]."  According to defendants, the USDA simply moved

24   details contained in the 2002 Rule to the Forest Service Manual and Handbook.  They

25   argue that the "practical effect . . . of this change in location of these standards is minimal

26   at best."  According to defendants, the shift was made to give the Forest Service greater

27   flexibility in management.

28        As for the EMS, defendants point to the 2002 Rule and preamble's

1   references to "the increased roles of 'adaptive management' and 'monitoring and

2   evaluation' in forest planning." 67 Fed. Reg. 72772-73; 72781-82.  They argue that

3   because the EMS is a "form of adaptive management," the public was on sufficient notice.

4   They also contend that the addition of the EMS provision simply "makes explicit what other

5   law requires or strongly suggests."

6        Concerning the forest plan provisions contested by plaintiffs (which defendants refer

7   to as plaintiffs' "administrative corrections" claim), defendants argue that the provisions

8   were expressly contemplated by the 2002 Rule. *See* 67 Fed. Reg. at 72803.  They further

9   argue that plaintiffs have misconstrued the 2002 Rule's provisions regarding changes in

10  timber management projects, and that the 2005 Rule's related provisions cannot be

11  considered a substantive change.

12       Plaintiffs respond that the 2005 Rule's elimination of the resource standards was "an

13  abrupt removal" as opposed to a simplification.  Plaintiffs also contend that defendants

14  cannot rely on vague "general direction" language in the preamble to the proposed rule as

15  sufficient notice regarding the 2005 Rule's new direction.  Plaintiffs further suggest that the

16  movement of details from the proposed rule to the agency handbook was significant

17  because directives in the handbook, unlike regulations, are not necessarily legally

18  enforceable and are easier for the agency to change.

19       As for the EMS, plaintiffs respond that neither the proposed rule, its preamble, public

20  comments, nor prior regulations, so much as mention EMS.  They cite to authority relied on

21  by defendants for the proposition that "*something* is not a logical outgrowth of *nothing*."

22  *See Kooritsky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994).  They argue that the 2002

23  Rule's reference to "adaptive management" was not sufficient notice, and the fact that the

24  USDA must define EMS even for this court demonstrates the inadequacy of the notice.

25       As for the alterations to the forest plans, plaintiffs respond that the 2002 Rule did not

26  contemplate the revisions to the 2005 Rule.  Plaintiffs assert that the 2002 Rule merely

27  permitted routine, non-policy corrections to be made to forest plans without public notice,

28  unlike the 2005 Rule, which permits changes in timber management projections and

    monitoring programs to be made without public notice.  Plaintiffs argue that there is a

1   substantial difference between:  (1) making adjustments to the monitoring methods used to

2   carry out an established monitoring program that requires various sorts of information

3   about the forest to be gathered and reported, which was the subject of the 2002 Rule; and

4   (2) changing the overall *substance* of that monitoring program and the level of information it

5   requires, which is what the 2005 Rule does.  *See* 67 Fed. Reg. 72790.

6        Defendants essentially reiterate their original arguments in reply.  Regarding the

7   EMS, defendants argue that it is an "internal practice that USDA can impose on itself

8   through the Forest Service Directives system with the same effect," and "because it is

9   purely discretionary and can be accomplished . . . without including it in the planning rules,"

10  it therefore was not a legally significant change to the 2005 Rule.  They again argue that it

11  was a "logical outgrowth" of the 2002 Rule.

12                        **d.    Analysis**

13       The relevant law is clear that an agency cannot promulgate without notice and

14  comment a final rule that constitutes a "paradigm shift" from the proposed rule for which

15  there was notice and comment.  The USDA admits that the 2005 Rule represented such a

16  shift.  *See* 70 Fed. Reg. at 1024.  The numerous changes between the 2002 Rule and the

17  2005 Rule included, among other things, the 2005 Rule's elimination of resource protection

18  standards, its creation of an EMS, and its addition of the provision regarding the alteration

19  of forest plans.  The court finds that these changes did not constitute "logical outgrowths" of

20  the proposed rule; nor were they "natural drafting evolution[s]."  *See NRDC II*, 279 F.3d at

21  1188.

22       As for the 2005 Rule's resource standards, the court cannot conclude that the

23  changes to the clearcutting, logging methods and standards and the diversity standards

24  were foreshadowed by the 2002 Rule, exempting the 2005 Rule's provisions from public

25  notice and comment.  As plaintiffs noted, the diversity standards themselves were the

26  subject of much public controversy, and the changes to the 2005 Rule, which were not

27  insignificant, required providing the public with an opportunity to evaluate them.

28       Regarding the creation of the EMS, the 2005 Rule's adoption of this management

system was similarly not foreshadowed by the 2002 Rule.  Because the 2002 Rule did not

1   even mention the system by name, the addition of the EMS to the 2005 Rule cannot be

2   considered an evolution of prior drafting as defendants have suggested.

3          Finally, the 2005 Rule's change to the decisionmaking procedures regarding

4   permissible logging also cannot be considered a logical outgrowth of the 2002 Rule.  The

5   2002 Rule anticipated public participation with respect to the monitoring of logging;

6   whereas, by contrast, the 2005 Rule shifted the monitoring entirely to the agency's

7   discretion and removed public oversight.  As with the first two changes, this provision

8   likewise cannot be considered a mere technical evolution of the 2002 Rule.

9          Accordingly, the USDA was required to afford interested parties the opportunity to

10  comment on the changes, and its failure to do so violated the APA.

11         **2.      Promulgation of the 2004 Interpretive Rule did not Violate the APA**

12                 **a.      Legal Standards**

13         When issuing a legislative or substantive rule, an agency must follow the notice and

14  comment procedure described in the APA, unless it first publishes a specific finding of good

15  cause documenting why such procedures "are impracticable, unnecessary, or contrary to

16  the public interest."  *Hemp Indus. Assoc. v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003)

17  (citing 5 U.S.C. § 553(b)).  However, the APA's notice and comment requirement does not

18  apply to interpretive rules.  *See id; Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004)

19  (citing 5 U.S.C. § 553(b)(3)(A)).

20         "Interpretive rules merely explain, but do not add to, the substantive law that already

21  exists in the form of a statute or a legislative rule."  *Id.* (noting that "[c]ourts have struggled

22  with identifying the difference between legislative rules and interpretive rules").  "Legislative

23  rules, on the other hand, create rights, impose obligations, or effect a change in existing

24  law pursuant to authority delegated by Congress."  *Id.*  In distinguishing between legislative

25  and interpretive rules, the Ninth Circuit has held that legislative rules have the "force of

26  law," while interpretive rules do not, and has adopted a three-part test for determining

27  whether a rule has the "force of law":

28         (1)      whether, in the absence of the rule, there would be an adequate
                    legislative basis for enforcement action;

1

2
      (2)      whether the agency has explicitly invoked its general legislative authority; or

3
      (3)      whether the rule effectively amends a prior legislative rule.

4
*Id.* (citing *American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109

5
(D.C. Cir. 1993)).

6
### b.    Parties' Arguments

7
Plaintiffs contend that with the 2004 Interpretive Rule, defendants sought to rescind

8
the 1982 Planning Regulations as the governing authority for site-specific Forest Service

9
decisions.  Plaintiffs argue that the 2004 Interpretive Rule was really legislative, and that

10
defendants sought to avoid the APA requirements for notice and comment by labeling the

11
regulatory change an "interpretive rule."  In support, plaintiffs assert that the 2004

12
Interpretive Rule replaced detailed 1982 Planning Regulations, "requiring" consideration of

13
species viability, with a generalized requirement that the Forest Service merely "consider"

14
"the best available science" in making site-specific decisions.  In this respect, plaintiffs

15
assert that the 2004 Interpretive Rule was inconsistent with the 1982 Planning Regulations

16
as well as the 2000 Planning Regulations.  Accordingly, plaintiffs argue that the interpretive

17
rule effectively amended a prior regulation, and was therefore subject to the APA notice

18
and comment requirements.  Because defendants failed to provide public notice and permit

19
comment, the rulemaking was therefore arbitrary, capricious, and an abuse of discretion.

20
Defendants do not dispute that the 2004 Interpretive Rule was promulgated without

21
notice and comment.  Instead, they argue that the rule was not legislative, and therefore no

22
notice or public comment was required.  According to defendants, the 2004 Interpretive

23
Rule merely "explained" that the site-specific provisions of the 1982 Planning Regulations,

24
such as the species viability provision, were no longer in effect, but had been supplanted

25
under the 2000 Planning Regulations' transition provision, which dictated that site-specific

26
activities were to be guided by the "best available" science principle.  Defendants argue

27
that according to the 2000 Rule's transition provision, the 1982 Regulations no longer

28
applied to site-specific projects.  Because the 2004 Interpretive Rule merely "stated

USDA's understanding of the transition provision of the 2000 . . . regulations and did not

1   itself change the degree to which the 1982 . . . regulations remained in effect," defendants

2   contend that it did not "amend" the prior 2000 Rule.

3        In support of their interpretation of the 2000 Rule's transition provision, defendants

4   cite to the Tenth Circuit's recent decision in *Utah Envtl. Cong. v. Bosworth,* 443 F.3d 732,

5   746-47 (10th Cir. 2006), and the Second Circuit's decision in *Forest Watch v. United States*

6   *Forest Serv.*, 410 F.3d 115, 118 (2d Cir. 2005), in which both courts interpreted the 2000

7   Rule's transition provision to require that, like the interpretive rule, the "best available

8   science" be considered in implementing site-specific projects.   In fact, according to

9   defendants, the courts held that the 1982 Rule no longer applied to site-specific projects

10  after implementation of the 2000 Rule's transition provision.  *Id.*  Defendants argue that like

11  the *Bosworth* court, this court should conclude that the interpretive rule was simply an

12  interpretation of existing regulations and did not have the force and effect of law.  *Id.*

13       Defendants note that prior to *Bosworth*, "application of the 2000 Rule was somewhat

14  inconsistent, as some courts did not examine the plain language of the 2000 Rule's

15  transition provision and acquiesced in misapplication of the provision by individual units of

16  the Forest Service."  *Bosworth*, 443 F.3d at 746 n.11.  They contend that the interpretive

17  rule was adopted in response to the inconsistent judicial results. *See* 69 Fed. Reg. 58055-

18  56.

19       In response, plaintiffs argue that the Second and Tenth Circuit decisions cited by

20  defendants are not persuasive because the courts ignored evidence that the USDA

21  intended that the 1982 Planning Regulations would apply to site-specific decisions during

22  the transition period.  Plaintiffs also contest the courts' interpretation of the 2000 Rule's

23  transition provision.  *See id.*  They argue that the subpart to the transition provision, which

24  referenced reliance on the "best available science," was not the exclusive provision

25  governing site-specific projects under the 2000 Rule.  In support, plaintiffs cite to the 2000

26  Rule's preamble.  65 Fed. Reg. at 67564.  Plaintiffs reiterate their original position that the

27  2000 Rule's transition provision required that the 1982 Rule remain in effect for site-specific

28  decisions until the 2000 Rule became effective.

1    In reply, defendants note that an interpretive rule can be used to clarify "regulatory

2  ambiguities" in a legislative rule, and contend that is what the interpretive rule did.

3  Defendants again rely on the Tenth Circuit's decision in *Bosworth* regarding construction of

4  the 2000 Rule's transition provisions, in arguing that the 2004 Interpretive Rule did not

5  amend the 2000 Rule.

6                          **c.     Analysis**

7    While this is somewhat of a close call given that the 2000 Rule's

8  transition provisions are hardly a model of clarity, the court finds in favor of the defendants,

9  and concludes that the 2004 Interpretive Rule was more akin to a clarifying rule than a

10  legislative rule.

11    The language of the 2000 Rule's transition provision does not clearly answer the

12  question regarding which standards remained in effect for site-specific plans during the

13  transition.[4]  That provision provided:

> (a) The transition period begins on November 9, 2000 and ends upon the completion of the revision process (§ 219.9) for each unit of the National Forest System. *During the transition period, the responsible official must consider the best available science in implementing and, if appropriate, amending the current plan.*

> (b) If, as of November 9, 2000, a plan revision or amendment has been initiated under the 1982 planning regulations in effect prior to November 9, 2000 (See 36 CFR part 219, revised as of July 1, 2000.) and if a notice of availability of a draft environmental impact statement or an environmental assessment is published by May 9, 2001 in the Federal Register, the responsible official may complete the amendment or revision process under the 1982 regulations or adjust the process to conform to the provisions of this subpart.

> c) If a review of lands not suited for timber production is required before the completion of the revision process, the review must take place as described by the provisions of § 219.28, except as provided in paragraph (b) of this section.

> (d) Site-specific decisions made by the responsible official 3 years from November 9, 2000 and afterward must be in conformance with the provisions of this subpart.

> (e) Within 1 year of November 9, 2000, the Regional Forester must withdraw the regional guide. When a regional guide is withdrawn, the Regional Forester must identify the decisions in the regional guide that are to be transferred to a

---

[4]To the extent this court stated otherwise in its October 2005 order, it was not making a finding based on disputed facts, because at that time, the issue was not disputed by the parties.  It has reconsidered the issue in this order.

1

2   regional supplement of the Forest Service directive system (36 CFR 200.4) or
    to one or more plans and give notice in the Federal Register of these actions.
3   The transfer of direction from a regional guide to a regional supplement of the
    Forest Service directive system or to one or more plans does not constitute
    an amendment, revision, or site-specific action subject to Forest Service
4   NEPA procedures.

5   (f) Within 3 years after completion of the revision process for a unit, the
    responsible official must complete the first monitoring and evaluation report
6   as required in § 219.11(f).

7   (g) Within 1 year of November 9, 2000, the Chief of the Forest Service must
    establish a schedule for completion of the revision process for each unit of the
8   National Forest System.

9   36 C.F.R. § 219.35.

10        On the one hand, the transition provision implies that the "best available science," a

11  standard which was new to the 2000 Rule, and clearly was *not* contained in the 1982 Rule,

12  should govern the *implementation and amendment of plans*.  *See* 36 C.F.R. § 219.35(a).

13  However, on the other hand, the transition provision also appears to simultaneously lack

14  clarity regarding *site-specific* decisions, providing only that "[s]ite-specific provisions made

15  by the responsible official 3 years from November 9, 2000 and afterward must be in

16  conformance with the provisions of this subpart."  *See id.* at § 219.35(d); *see also* 65 Fed.

17  Reg. at 67563 (commenting that "[f]or site-specific decisions, section 219.35(d) provides a

18  three-year time period for transition between the existing regulations and the new rule").

19  That subpart to the transition provision, however, is not explicit regarding the *standards* to

20  be applied to *site-specific* decisions during this transition.

21        The 2004 Interpretive Rule itself, and the Tenth Circuit, which dealt with the

22  ambiguity of the 2000 Rule's transition provisions, have noted the confusion encountered

23  by the courts in applying the provisions.  *See Bosworth*, 443 F.3d at 745 (citing this court's

24  October 14, 2005 order among the many other courts to have confronted the issue); 69

25  Fed. Reg at 58055 (noting that "[c]onsiderable uncertainty has arisen regarding the impact

26  of the 2000 planning rule and the transition provisions").  The *Bosworth* court correctly

27  noted that the USDA issued the interpretive rule to address this very confusion.  *Bosworth*,

28  443 F.3d at 746.  Guided by the language of the 2000 Rule's transition provisions, in
    addition to the interpretive rule, the *Bosworth* court concluded that the 2000 Rule's

transition provision indeed required consideration of the "best available science" in implementing site-specific plans.  *Id.* at 747.  In fact, it noted that "this language [regarding consideration of "the best available science"] is the *sole* direction to the Forest Service regarding project-level actions."  *Id.* (emphasis added).  It concluded that the transition provision "leaves little doubt that the Forest Service is limited to consideration of the best available science when approving a project during the transition period," and that "[t]he interpretive rule confirms this interpretation in no uncertain terms."  *Id.*

This court finds *Bosworth* persuasive, and concludes that plaintiffs simply have not demonstrated that, as a matter of law, the interpretive rule was legislative in nature. Instead, both the case law and the regulatory history suggest otherwise - that the interpretive rule was enacted to clarify the ambiguous and problematic transition provision of the 2000 Rule.  Given that the 2004 Interpretive Rule was of a clarifying nature, the APA did not require public notice and comment prior to its issuance.

**3.     The Agency Violated NEPA When it Invoked the CE**

        **a.     NEPA's Legal Framework**

NEPA, 42 U.S.C. § 4231 et seq., is a procedural statute that does not "mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."  *High Sierra Hikers Assoc. v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004).  NEPA requires a federal agency such as the Forest Service to prepare a detailed environmental impact statement ("EIS") for "all major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).

"Major federal actions" have been defined to include, among other things, "new or revised agency rules, regulations, plans, policies or procedures, and legislative proposals." 40 C.F.R. § 1508.18(a); *see also* Daniel R. Mandelker*, NEPA Law and Litigation*, § 8:27 (2005 Suppl.) ("Federal agency rules and regulations are federal actions that may require the preparation of an impact statement.").   "Effects" is also defined broadly to include ecological, aesthetic, historic, cultural, economic, social, and/or health effects, whether direct, indirect, or cumulative.  *See* 40 C.F.R. § 1508.8.   It includes both "direct" and

1   "indirect" effects, the latter defined as those that "are caused by the action and are later in

2   time or farther removed in distance, but are still reasonably foreseeable."  *Id.*  These may

3   include "growth inducing effects and other effects related to induced changes in the pattern

4   of land use, population density or growth rate, and related effects on air and water and

5   other natural systems, including ecosystems."  *Id.*  Moreover, "effects" also includes those

6   that the agency believes may, on balance, be beneficial to the quality of the human

7   environment.  *See id.*

8          Regulations issued by the Council of Environmental Quality ("CEQ"), established by

9   Congress, provide certain factors that an agency should consider in determining whether

10  an action will "significantly" effect the environment.  These include, among others: (1) the

11  degree to which the proposed action affects public health or safety; (2) the degree to which

12  the effects will be highly controversial; (3) whether the action establishes a precedent for

13  further action with significant effects; and (4) whether the action is related to other action

14  which has individually insignificant, but cumulatively significant impacts.  *See* 40 C.F.R. §

15  1508.27(b).

16         Prior to preparing an EIS, the agency may prepare an Environmental Assessment

17  ("EA") as a preliminary step in determining whether the environmental impact of the

18  proposed action is significant enough to warrant an EIS.  *See* 40 C.F.R. § 1508.9.  An EA is

19  a "concise public document that briefly provides sufficient evidence and analysis for

20  determining whether to prepare an EIS or a finding of no significant impact."  *Blue*

21  *Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citing 40

22  C.F.R. § 1508.9).  An EA must be prepared unless the agency decides to go ahead and

23  prepare an EIS, *see* 40 C.F.R. § 1501.3(b), or unless the action comes within a categorical

24  exclusion ("CE"), as discussed below.  *See* 40 C.F.R. § 1508.9.

25         If, after preparing an EA, an agency determines based on the factors specified in 40

26  C.F.R. § 1508.27(b), set forth above, that "substantial questions are raised as to whether

27  the project may cause significant degradation of some human environmental factor," the

28  agency is required to prepare an EIS.  *See West v. Sec'y of Dept. of Transp.*, 206 F.3d

920, 927 (9th Cir. 2000).  If, however, the EA reveals that the project will not have a

29

significant effect on any aspect of the environment, the agency issues a "finding of no significant impact," or "FONSI," pursuant to 40 C.F.R. § 1508.13, and no EIS is subsequently required.  *West*, 206 F.3d at 927.

However, in some cases, neither an EA nor an EIS is required.  *See id.* (citing 23 C.F.R. § 771.115).  The CEQ has promulgated NEPA regulations, which authorize an agency to use a CE for a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." *Id.* (citing 40 C.F.R. § 1508.4).   "Neither an EIS nor an EA is required for actions categorically excluded from NEPA review."  *Id.* (citing 40 C.F.R. § 1507.3(b)(2)(ii); 23 C.F.R. § 771.117).

The CEQ introduced CEs in 1978 for the purpose of reducing agencies' paperwork associated with EISs by allowing agencies to utilize CEs in cases where the proposed action did not have significant environmental effects.  *See* Mandelker, NEPA Law & Litigation § 7:10, at 7-30.  By definition, CEs are limited, though, "to situations where there is an insignificant or minor effect on the environment."  *Alaska Ctr. for the Env't v. United States Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).

Even if a proposed action appears to fit the CE invoked, an agency may not use a CE when "extraordinary circumstances" exist.  *California v. Norton*, 311 F.3d 1162, 1168 (9th Cir. 2002) (citing 40 C.F.R. § 1508.4).   "Extraordinary circumstances" has been defined as those " in which a normally excluded action may have a significant environmental effect."  *Id.*  In cases where "extraordinary circumstances" exist, the proposed action requires preparation of an EA or an EIS.  *Id.*

In determining the propriety of the use of a CE, the agency is required to utilize what is referred to as a "scoping process" to "determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action." *Alaska Ctr.*, 189 F.3d at 859 (citing 40 C.F.R. § 1501.7) (noting that the Forest Service is required to conduct scoping for "all proposed actions, including those that would appear to be 'categorically excluded'").  The CEQ regulations do not set forth a specific procedure for scoping, but

1   instead leave most of the decisions regarding scoping to the relevant federal agency.

2   Mandelker, NEPA Law & Litigation, § 7:12 (Suppl. 2006); *see also Kootenai Tribe v.*

3   *Veneman*, 313 F.3d 1094, 1116-17 (9th Cir. 2002) (noting that "the affirmative duties NEPA

4   imposes on a government agency during the scoping period are limited").  One of the

5   purposes of "scoping" includes notifying those who may be affected by a government

6   proposal that the agency is beginning to consider the impacts of the proposed action.  *Id.*  If

7   the scoping process ultimately reveals the existence of "extraordinary circumstances

8   having a significant effect on [the] environment," the agency may not simply invoke the CE,

9   and is required, at a minimum, to prepare an EA.  *See Alaska Ctr.*, 189 F.3d at 859

10          The arbitrary and capricious standard is applied "to an agency's determination

11   that a particular action falls within [a] categorical exclusion[]."  *Bicycle Trails Council of*

12   *Marin v. Babbitt*, 82 F.3d 1445, 1456 (9th Cir. 1996); *Norton*, 311 F.3d at 1176.  To

13   determine whether agency action is arbitrary or capricious, a court must consider whether

14   the decision was based on a consideration of the relevant factors and whether there has

15   been a clear error of judgment.  *Alaska Ctr.*, 189 F.3d at 859.

16          "When an agency decides to proceed with an action in the absence of an EA or EIS,

17   the agency must adequately explain its decision."  *Id.*  It is important that the agency be

18   able to point to "a record of decision invoking a categorical exclusion."  *Norton*, 311 F.3d at

19   1176 (discussing *Bicycle Trails*, 82 F.3d at 1456-57).  The Ninth Circuit has noted the

20   difficulty in determining whether the agency's determination to invoke a CE is arbitrary and

21   capricious, especially in cases "where there is no contemporaneous documentation to

22   show that the agency considered the environmental consequences of its action and

23   decided to apply a categorical exclusion to the facts of a particular decision."  *Id.*

24          If an agency fails to prepare an EA when it has an obligation to do so (and instead

25   improperly invokes a CE), the court should remand to the agency for preparation of an EA,

26   even if the court thinks that the proposed action would have no significant impact.  *See*

27   Coggins & Glicksman, 2 Pub. Nat. Resources L. § 10g:6, Exemptions and Exclusions from

28   NEPA Obligations (2006). Courts lack the administrative record necessary to make the

decision themselves, and assumption of these duties by the courts would circumvent

1   NEPA's policy to involve other agencies and the public in the study process.  *See id*; *see*

2   *also* Mandelker, NEPA Litigation, at § 8:48 (Suppl. 2006) (where no assessment -- EA or

3   EIS – has even been prepared, the issue before the court is limited to a finding of whether

4   the CE was appropriate, and district court may not make a finding of no significant impact).

5                              **b.      Parties' Arguments**

6          There is no dispute that here, the USDA did not prepare either an EA or an EIS in

7   conjunction with the 2005 Rule.  Plaintiffs contend that defendants violated NEPA by failing

8   to prepare an EIS for the 2005 Rule, and by categorically excluding the 2005 Rule from any

9   NEPA analysis. They argue that the USDA was required to prepare an EIS because the

10  2005 Rule constituted a major federal action that may result in significant impacts on the

11  environment, that it is not covered by a CE, and that even if it was covered by a CE,

12  "extraordinary circumstances" made a CE's use inappropriate.  Defendants contend that

13  the USDA reasonably concluded that the 2005 Rule was covered by a CE and that any

14  potential environmental impacts flowing from the 2005 Rule are distant and based on an

15  unpredictable chain of events.

16         There are two sub-parts to the NEPA claim that the court considers: (1) first, whether

17  the CE was appropriately invoked; and (2) second, whether "extraordinary circumstances"

18  exist that indicate that the 2005 Rule "may have a significant environmental effect"

19  precluding the use of a CE.

20                              **i.      Invocation of the CE**

21         Plaintiffs argue that the USDA's use of the CE was arbitrary and capricious.

22  They note that the CE relied on by the USDA for the 2005 Rule is found in the FSH under

23  the category "routine administrative, maintenance, and other actions."  Plaintiffs further note

24  that examples in the FSH of the appropriate use of the CE include actions such as closing

25  roads to protect animals, mowing lawns, and applying herbicides to control poison ivy.

26  They argue that there is no comparison between these examples and the agency action in

27  this case –  the promulgation of a rule that dictates what must be in a forest plan –  and that

28  there is nothing "routine" about revision of the NFMA regulations.

1    Defendants contend that the USDA's interpretation and application of the CE was

2    neither erroneous, nor inconsistent with the regulations.  They argue that the 2005 Rule fits

3    the CE listed in FSH 1909.15, § 31.12, which provides as follows:

4         31.12 Categories Established by the Chief

5         The following categories of routine administrative, maintenance, and other
          actions normally do not individually or cumulatively have a significant effect on
6         the quality of the human environment (sec. 05)  and, therefore, may be
          categorically excluded from documentation in an EIS or an EA unless scoping
7         indicates extraordinary circumstances (sec. 30.03) exist:

8         . . . .

9              2.    Rules, regulations, or policies to establish Service-wide
                     administrative procedures, program processes, or instructions.
10                   Examples include but are not limited to:

11                   a.    Adjusting special use or recreation fees using an existing
                           formula.
12
                     b.    Proposing a technical or scientific methodology or
13                         procedure for screening effects of emissions on air
                           quality related values in Class I Wildernesses.
14
                     c.    Proposing a policy to defer payments on certain permits
15                         or contracts to reduce the risk of default.

16                   d.    Proposing changes in contract terms and conditions or
                           terms and conditions of special use authorization.
17
                     e.    Establishing a Service-wide process for responding to
18                         offers to exchange land and for agreeing on land values.

19                   f.    Establishing procedures for amending or revising Forest
                           Land and Resource Management Plans.
20
          Defendants argue that the 2005 Rule fits the above CE because it merely identifies
21
     the procedures and standards for *later* development of forest plans, plan amendments, and
22
     plan revisions. They assert that the rule does not change the physical environment in any
23
     way, and that there will be no direct environmental impacts.
24
          Plaintiffs counter that with the 2005 Rule, the USDA has taken a new position
25
     regarding NEPA analysis with respect to revisions to NFMA regulations.  Plaintiffs
26
     emphasize that application of the CE is a departure from prior USDA interpretations of the
27
     CE – noting that in the past, the USDA prepared an EA for the 1982 and 2000 revisions of
28
     the regulations.  Plaintiffs assert that the USDA's new position is that it intends to publicly

1    assess and disclose the environmental effects of only those decisions that impact a site or

2    specific project, as opposed to those with a broad, programmatic impact.  They contend

3    that the 2005 Rule also demonstrates that the USDA has expanded the number of projects

4    it intends to categorically exclude from any NEPA analysis.

5         Plaintiffs further assert that because the 2005 Rule does more than simply establish

6    procedures for amending and revising forest plans, it does not fit the CE invoked by the

7    USDA.  Specifically, plaintiffs note that the 2005 Rule states that it "establishes

8    requirements for sustainability of social, economic, and ecological systems," 70 Fed. Reg.

9    1023 (Jan. 5, 2005), and "describes the nature and scope of plans and sets forth the

10   required components of a plan."  36 C.F.R. § 219.1.

11        Defendants reply that the CE at issue here (which they refer to as "CE 2") does not

12   restrict certain actions based on their "magnitude," as asserted by plaintiffs.  They argue

13   that the CE covers "both small-scale actions and national rules such as the 2005 Rule."

14   They also assert that CE 2 covers procedural rules as opposed to ground-disturbing

15   activities, and that "bounds on size" are not relevant.

16        Defendants further suggest that the absence of an EA or EIS with respect to the

17   2005 Rule is not a significant shift in USDA policy.  They assert that although EAs were

18   prepared in 1982 and 2000, the findings based on those EAs were that the rule changes

19   presented no significant impact on the environment.  Nevertheless, they also note that the

20   USDA's views on the necessity of EAs and EISs "can lawfully evolve over time."

21                    **ii.    Extraordinary Circumstances/Significant
                             Effects**

22

23        Plaintiffs also argue that the 2005 Rule has a significant effect on the environment

     because it eliminates and weakens former substantive protective standards that governed
24
     forest plans and site-specific projects.  Specifically, they assert that the rule eliminates
25
     species viability standards, minimum specific management requirements, and also a layer
26
     of protection for site-specific projects.[5]
27

28
     _____

          [5]Plaintiffs assert that prior NFMA regulations applied directly to site-specific projects,
     therefore subjecting site-specific projects to both the relevant forest plan and the mandatory
     regulations.  They contend that under the 2005 Rule, site-specific projects need only comply

1    Plaintiffs contend that a rule that significantly weakens the regulatory framework for

2    the National Forest System satisfies the requisite "may effect" threshold requiring

3    preparation of an EIS.  They argue that even though the effects may be one or two steps

4    removed from site-specific activities, the USDA is still required to complete an EIS.

5    Defendants respond that the 2005 Rule "does not change the physical environment

6    in any way," and that there will be no direct environmental impacts.  In support, they assert

7    that there must be a "reasonably close causal relationship" before an impact is cognizable

8    for NEPA purposes.  They contend that there are too many contingencies in this case –

9    and that it is only after new forest plans are adopted and site-specific projects are proposed

10   that effects will become identifiable.  Defendants further argue that the Ninth Circuit's

11   decision in *Citizens for Better Forestry v. United States Dept. of Agric.* ("*Citizens*") is not

12   controlling because that case concerned standing and ripeness and did not reach the

13   merits regarding the necessity of an EA or an EIS.   341 F.3d 961 (9th Cir. 2003).

14   Plaintiffs reply that defendants are wrong to insist that once the USDA determined

15   that a particular CE applied to the 2005 Rule, no EA was required.  Plaintiffs argue that

16   regardless of the applicability of any CE, the USDA was still required to prepare a NEPA

17   analysis if there was any uncertainty whether the 2005 Rule may result in a significant

18   effect on the environment.

19   Plaintiffs also argue that even if defendants are correct that the 2005 Rule will not

20   "change the physical environment in any way *now,*" that does not determine whether an EA

21   or an EIS was required.  They assert that the CEQ regulations are clear that "broad,

22   programmatic agency actions" including revised regulations may require an EA or EIS, and

23   that Ninth Circuit case law defines environmental effects broadly to include both direct and

24   indirect effects.

25   Plaintiffs assert that contrary to the "reasonably close causal relationship" standard

26   advocated by defendants, the appropriate inquiry is instead whether the environmental

27   impacts are "so remote and highly speculative" that NEPA does not require an EA or EIS.

28
_____

with the relevant forest plans.

1  Plaintiffs argue, though, that either test is satisfied.  In support, they rely on the Ninth

2  Circuit's decision in *Citizens,* which they assert stands for the proposition that the

3  weakening of substantive environmental requirements at the national regulatory level will

4  undermine "the environmental safeguards" in forest plans promulgated under them, which

5  will in turn then undermine such environmental protections at site-specific levels as well.

6        In reply, defendants again assert that the Ninth Circuit's decision in *Citizens* did not

7  reach the merits of the necessity of an EA or EIS with respect the 2000 Rule, but instead

8  dealt only with issues of standing and ripeness.  Defendants also reiterate their opening

9  arguments regarding why use of a CE was not precluded in this case.  In sum, they

10 contend that the 2005 Rule was a neutral planning rule with no direct environmental

11 impacts, and for which it would be nearly impossible to measure the indirect impacts.

12                              **c.      Analysis**

13       Having extensively reviewed the cases and other legal authorities, the court is

14 convinced that this case comes before it with a fairly unique factual and procedural

15 background.  It is not unique simply because it involves a broad, nationwide rule as

16 defendants suggest.  Rather, a more significant reason why the case is unique is that in

17 excepting the 2005 Rule from NEPA analysis, the USDA appears to have charted a new

18 path and adopted a new policy approach regarding programmatic changes to

19 environmental regulations.

20       NEPA requires *some* type of procedural due diligence - even in cases involving

21 broad, programmatic changes – a fact defendants ignore in their briefs.  Although

22 defendants' position regarding the feasibility and practicality of preparing an EIS or an EA

23 in the case of broad, programmatic rules is not nonsensical, it is contrary to the purpose of

24 NEPA and to the existing case law.

25       NEPA does indeed contemplate preparation of EAs and EISs in the case of

26 programmatic rules and changes.  The CEQ regulations governing NEPA specifically

27 envision programmatic environmental impact statements.  The pertinent regulations provide

28 that:

1
2       Environmental impact statements may be prepared, and are sometimes
        required, for broad Federal actions such as the adoption of new agency
3       programs or regulations (§ 1508.18). Agencies shall prepare statements on
        broad actions so that they are relevant to policy and are timed to coincide with
        meaningful points in agency planning and decisionmaking.

4  40 C.F.R. § 1502.4(b).

5          Additionally, programmatic EISs have been recognized and utilized in a number of

6  cases before the Ninth Circuit.  *See, e.g., Friends of Yosemite Valley v. Norton*, 348 F.3d

7  789 (9th Cir. 2003) (discussing the distinction between site-specific and programmatic

8  EISs, and holding that programmatic EIS prepared in conjunction with creation of a land

9  management plan for Yosemite was sufficient at the implementation stage and provided

10  guidelines for future actions*); Northern Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969 (9th

11  Cir. 2006) (concluding that programmatic EIS prepared by Forest Service with respect to oil

12  and gas leasing in Alaskan preserves was sufficiently site-specific even though it lacked

13  analysis of the effect on each parcel since there was no way of knowing at time

14  programmatic EIS was prepared what development would materialize*); Northern Alaska*

15  *Envtl. Ctr. v. Lujan*, 961 F.2d 886 (9th Cir. 1992) (holding programmatic EIS prepared in

16  conjunction with approval of mining in Alaskan parks was adequate*); California v. Block*,

17  690 F.2d 753 (9th Cir. 1982).

18          The Ninth Circuit's recognition of the propriety of programmatic EISs, and its

19  distinction between the requirements for programmatic EISs and site-specific EISs,

20  suggests that, at least in this circuit, NEPA's requirement of an EIS is *not* necessarily

21  limited to site or project-specific impacts or activities, as defendants suggest.  In

22  recognizing programmatic EISs, the Ninth Circuit has held that "[a]n EIS for a programmatic

23  plan . . . must provide 'sufficient detail to foster informed decision-making,' but that 'site-

24  specific impacts need not be fully evaluated until a critical decision has been made to act

25  on site development.'" *Friends of Yosemite*, 348 F.3d at 800 (quoting *Lujan*, 961 F.2d at

26  890); *see also Block*, 690 F.2d at 761 (explaining that considerations regarding the

27  adequacy of a programmatic EIS may differ from those for a site-specific EIS).

28

37

1    Thus, defendants' argument that an EA or an EIS was not feasible based on the

2    nature of the 2005 Rule is not particularly persuasive given the fact that such analysis has

3    been undertaken in the past in the case of programmatic rules and actions.

4    Given that programmatic EISs and EAs are feasible and anticipated by NEPA, the

5    question then becomes whether the agency properly invoked the CE in this case in order to

6    avoid preparation of either.  As noted, this determination requires consideration of whether

7    the agency conducted the appropriate scoping and prepared an adequate record of

8    decision when invoking the CE; whether the CE in this case applied to the action taken;

9    and whether extraordinary circumstances existed because the 2005 Rule may have

10   significant effects.

11   Plaintiffs have not really addressed the particular scoping process utilized by the

12   agency prior to invocation of the CE in this case.  Assuming that the agency conducted the

13   requisite scoping and prepared an adequate record when invoking the CE,[6]  the court

14   nevertheless concludes that the agency misapplied the CE.  The USDA essentially

15   determined that the 2005 Rule satisfied a CE never before invoked for such large scale

16   actions, and concluded that no further NEPA analysis was required.

17   The Ninth Circuit has held that in evaluating an agency's use of a CE, the issue is

18   not only whether the project will cause significant environmental impacts, but "whether the

19   path taken to reach the conclusion was the right one in light of NEPA's procedural

20   requirements."  *West v. California,* 206 F.3d 920, 929 (9th Cir. 2000).  In *West,* the court

21   concluded that the authorization of "an entirely new, $18.6 million, four-lane,

22   'fully-directional' interchange constructed over a former Superfund site and requiring

23   500,000 cubic yards of fill material, 30,000 tons of crushed surfacing, and 32,000 tons of

24   asphalt concrete pavement" was an arbitrary and capricious application of the Federal

25   Highway Administration's CE for "changes in [highway] access control." *Id.* at 928.  The

26   court reasoned that "[n]one of the examples" of the projects described in the CE even

27   "approache[d] the magnitude" of the highway interchange, which "strongly suggest[ed] that

28

[6]The court, however, makes no such finding.  The parties simply have not addressed the adequacy of the scoping process.

1    the CE [was] not appropriate." *Id.*  The *West* court thus concluded that by proceeding

2    under an inappropriate CE, the agency "selected the wrong path," and "environmental

3    assessment was required and the review process should have been different." *Id.* at 929.

4         No Ninth Circuit case involving invocation of a CE, that was upheld on appeal,

5    involved broad, far-reaching, programmatic actions such as the 2005 Rule.  One of the

6    cases in which the Ninth Circuit upheld an agency's use of a CE concerned the Forest

7    Service's issuance of commercial helicopter permits in an Alaskan forest.  *See Alaska Ctr.*,

8    189 F.3d at 851.  In that case, the Forest Service invoked a CE that specifically applied to

9    the "approval, modification, or continuation of minor short-term (one-year or less) special

10   uses of National Forest land." *Id.* at 854.  The court upheld the agency's application of that

11   CE, and also affirmed the district court's determination that the Forest Service's scoping

12   process revealed that no extraordinary circumstances required the preparation of an EA or

13   EIS with respect to the helicopter permits. *Id.*

14        The action for which a CE was invoked in *Bicycle Trails* was of a similarly narrow

15   scope.  82 F.3d at 445.  In that case, the National Park Service relied on a CE to exclude

16   from NEPA review the promulgation of rules governing bicycle use in national parks.  The

17   court upheld the agency's determination that the rule fell within the CE and that

18   extraordinary circumstances did not exist.  *See id.* at 1457; *see also Southwest Ctr. for*

19   *Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443 (9th Cir. 1996) (upholding

20   agency's invocation of CE as pertained to rule allowing timber salvage sale in a portion of

21   the Coronado National Forest that had been damaged by a forest fire); *but see Norton*, 311

22   F.3d at 1162 (concluding that government needed to better document application of CE

23   where there was not sufficient evidence that it had given the requisite "hard look" required

24   by NEPA to oil lease suspensions that allowed oil companies to maintain production rights).

25        Here, like the interchange project in *West*, the USDA selected the wrong procedural

26   path in applying the CE.   The CE utilized here had never before been used to justify

27   projects of the scope or magnitude of the 2005 Rule.  While the CE included the

28   establishment of "procedures for amending or revising" forest plans, there is nothing to

     suggest that it applies to the wholesale adoption of nationwide rules that include the many

broad revisions presented by the 2005 Rule.  Additionally, although the propriety of the new CE *is not* at issue in this case, the fact that the agency felt compelled to enact a new CE at the same time as the 2005 Rule also supports the conclusion that the prior CE that was utilized in this case did not fit the 2005 Rule.

In addition to the inapplicability of the particular CE to the 2005 Rule, the possibility of significant effects also prohibited the use of a CE.  Application of a CE is inappropriate if there is the possibility that an action *may have* a significant environmental effect.  *Norton*, 311 F.3d at 1168 (citing 40 C.F.R. § 1508.4).   Here, plaintiffs, in their motion papers and in the supplemental briefing ordered by the court, have referred to a number of potential significant effects that *may* result from implementation of the 2005 Rule.  These include, among others, the effects on future site-specific plans, species diversity, species monitoring, logging, and forest planning.

The parties' arguments and briefing on this issue are particularly problematic.  The USDA made a finding of no significant impact, allowing for application of the CE, without conducting *any* NEPA consultation - even the preliminary step of preparation of an EA.  In most of the cases where the agency made a finding of no significant impact, an EA was prepared first and *then* the agency determined no EIS was necessary.  Here, the parties seem to put the cart before the horse, and request that the court make a finding regarding the precise nature of and the exact forseeability of significant effects in this case, when all that is required to render the CE inappropriate is the *possibility* of significant effects.  *See id.*

In the cases cited by defendants in support of their arguments that the agency action here lacked the potential for having a significant effect, the agency had engaged in some type of investigation and compiled some type of record, which supported its conclusion that there was no significant effect.  *See, e.g., Lujan*, 961 F.2d at 891 (upholding sufficiency of programmatic EIS); *Kempthorne*, 457 F.3d at 974-78 (upholding sufficiency of programmatic EIS); *cf. Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995) (holding where department designated lands to be considered proposed critical habitat for owl under ESA, that, as a matter of law, compliance with ESA requirements did not require

1  NEPA consultation).  In fact, in the vast majority of Ninth Circuit cases in which the court

2  considered whether significant effects existed, the court was considering *either* the

3  sufficiency of the EIS that had already been prepared *or* the propriety of the agency's

4  FONSI (finding of no significant effect) *following preparation of an EA.  See, e.g., Anderson*

5  *v. Evans*, 371 F.3d 475 (9th Cir. 2004) (where EA was prepared, concluding that EIS was

6  necessary in conjunction with whaling quota because the possible environmental effects

7  were sufficiently uncertain and controversial); *Blue Mountains*, 161 F.3d at 1212 (where EA

8  was prepared, concluding that EIS was necessary in case of Forest Service's award of

9  contracts for timber salvage sales based on its failure to sufficiently document resulting

10  risks to fish in the waterways); *Idaho Conservation League*, 956 F.2d at 1516 (upholding

11  adequacy of EIS prepared in conjunction with Forest Service's decision to recommend

12  against wilderness designation for roadless areas in Idaho forest); *Kootenai Tribe*, 313 F.3d

13  at 1110 (holding EIS sufficient where both EA and EIS were prepared with respect to

14  Forest Services' adoption of roadless area conservation rule); *San Luis Obispo Mothers for*

15  *Peace v. Nuclear Reg. Comm'n*, 449 F.3d 1016, 1032 (9th Cir. 2006) (finding of no

16  significant effect in connection with EA prepared in conjunction with approval of electrical

17  utility proposal for fuel storage was abuse of discretion where agency failed to consider

18  environmental consequences of potential terrorist attack on nuclear facility).

19      Such is not the case here.  Because the USDA invoked the CE, it did not create a

20  record that enables this court to make the type of determination that it now seeks.  Not only

21  does the absence of a record prevent the court from making such a definitive

22  determination, it appears from the limited legal authority on the issue, that the court *should*

23  *not* make the determination requested by the parties without such a record.

24      The USDA, having determined that a CE applied, asks this court to engage in the

25  very analysis regarding the existence of significant effects that its CE invocation rendered

26  unnecessary.  It asks this court to conclude, without the benefit of even an EA, that the

27  2005 Rule will not have significant effects or that the potential effects are unduly remote.

28  The findings that defendants seek to have this court make, and the legal standards that it

seeks to have the court apply, are not only more appropriate but are only possible in cases

1  in which an EA has been prepared.  The court cannot operate in a vacuum, and it cannot

2  determine based on the record before it whether the likelihood of the possible significant

3  effects here is as remote or as improbable as those in cases in which an EA had already

4  been prepared.

5       The court agrees with defendants that evaluating the environmental effects of

6  programmatic actions is difficult.  However, as discussed above, such evaluation appears

7  to be envisioned by NEPA and by Ninth Circuit case law.  There is nevertheless a dearth of

8  case law applying NEPA analysis to broad, nationwide actions such as that presented by

9  this case.  The majority of NEPA cases involve narrower agency actions.  *See Seattle*

10  *Community Council*, 961 F.2d 829 (9th Cir. 1992) (FAA order changing flight patterns at

11  Seattle-Tacoma airport); *Alaska Ctr.,* 189 F.3d at 851 (one-year special use helicopter

12  permits); *Blue Mountains*, 161 F.3d at 1212 (award of contracts for timber salvage sales);

13  *High Sierra Hikers*, 390 F.3d at 630 (special use permits to commercial packstock

14  operators in John Muir and Ansel Adams wilderness areas); *Idaho Conservation League*,

15  956 F.2d at 1516 (recommendation against wilderness designation for roadless areas in

16  Idaho Panhandle Forest); *Kempthorne*, 457 F.3d at 969 (oil and gas leasing); *see also*

17  *California ex rel. Lockyer v. United States Dep't of Agric.*, 459 F.Supp.2d 874 (N.D. Cal.

18  2006) (regarding "State Petitions Rule," replacing what had been referred to as the

19  "Roadless Rule" that had prohibited road construction and timber harvesting in areas of the

20  national forests).

21       However, this does not mean that environmental analysis regarding broad

22  programmatic changes cannot take place.  As discussed above, EAs and EISs have been

23  prepared in the case of programmatic and policy changes, and were prepared for both the

24  1982 and 2000 Rules.  *See, e.g., Friends of Yosemite Valley*, 348 F.3d at 789 (EIS

25  prepared in conjunction with creation of comprehensive management plan for Yosemite).

26  There is no reason that the same requirements should not apply to a *nationwide*

27  programmatic change such as the promulgation of the 2005 Rule.

28       The USDA, at a minimum, should have prepared an EA in this case.  Application of

the CEQ regulations suggest at least three reasons why the 2005 Rule *may have*

42

1  significant environmental effects.  *See* 40 C.F.R. § 1508.27(b).  First, there can be little

2  question that the effects of the 2005 Rule are "highly controversial."  The Ninth Circuit has

3  held that a proposal is highly controversial when there is a "substantial dispute about the

4  size, nature, or effect of the major Federal action."  *Blue Mountains*, 161 F.3d at 1212.

5  Second, the 2005 Rule may establish a precedent for further action with significant effects;

6  and finally, the 2005 Rule may be related to other action which has individually insignificant,

7  but cumulatively significant impacts.  *See* 40 C.F.R. § 1508.27(b).

8      Moreover, the Ninth Circuit's decision in *Citizens* further undermines the defendants'

9  position regarding the existence of significant effects.  *Citizens* concerned a previously

10  mentioned predecessor of the 2005 Rule – the 2000 Rule.  *See* 341 F.3d at 965.  In that

11  case, the plaintiffs claimed violations of NEPA and ESA based on the USDA's denial of a

12  notice and comment procedure when it made a finding of "no significant impact" under

13  NEPA, and a finding of "no effect" under ESA.  *Citizens* defendants argued that plaintiffs

14  lacked standing because the 2000 Rule did not pose a "reasonably probab[le]" threat to

15  plaintiffs' interests.  *Id.* at 972.  The Ninth Circuit discussed in depth the 2000 Rule, which

16  eliminated many of the same types of standards also eliminated by the 2005 Rule at issue

17  here.  *See id.* at 972-73.

18      In discussing the standing issue, the Ninth Circuit noted that, "[t]he 2000 . . . Rule in

19  fact does not result in any direct environmental effects.  Its environmental impact is indirect:

20  because the Rule controls the development of LRMPs and site-specific plans, it is through

21  these that it poses an actual, physical effect on the environment in national forests and

22  grasslands."  *Id.* at 973.

23      It rejected similar arguments regarding the hypothetical nature of causation, as

24  made by defendants in this case.  *Id.* at 973-74.  Specifically, the court concluded that a

25  programmatic, plan development rule "plays some, if not a critical, part in subsequent

26  lower-level decisions."  *Id.*  at 975.  It noted that the defendants' argument "that there is no

27  reason to believe that lower environmental safeguards at the national programmatic level

28  will result in lower environmental standards at the site-specific level," rendered procedural

plan development regulations "superfluous" and erroneously treated them as mere "paper-

1 pushing." *Id.* Instead, the Ninth Circuit agreed with the *Citizens* plaintiffs' arguments, that

2 even though the chain of causation was indirect, harm was still reasonably probable to

3 occur since regional LRMPs and site-specific plans will follow the requirements of the

4 national [2000] rules (as they must). *Id.* at 974-75.

5       The *Citizens* court's conclusion regarding the impact of programmatic changes

6 supports a determination here that the 2005 Rule may indeed have significant effects on

7 site-specific plans. The *Citizens* court explicitly found that:

8       An examination of the three-tiered regulatory system for the management of
      national forests and grasslands reveals that when the 2000 . . . Rule is

9       implemented, harm to Citizens' concrete interests is reasonably probable.
      *Even components that apply indirectly to site-specific plans will (with*

10       *reasonable probability) influence for the worse the environmental safeguards*
      *in LRMPs promulgated thereunder, which in turn will likely result in less*

11       *environmental safeguards at the site-specific plan level.*

12 *Id.* at 975 (emphasis added).

13       The court finds that the USDA violated NEPA both by invoking the particular CE at

14 issue here and because the invocation of any CE is inappropriate if the agency action may

15 have significant effects on the environment as defined by the CEQ regulations. With regard

16 to the latter, no record exists of any environmental analysis, and as a result the court has

17 no basis upon which to find an absence of significant effects. If the USDA wishes to obtain

18 a ruling that no significant effects are likely, it will first have to prepare an EA, and then if

19 necessary an EIS supporting this conclusion. After preparation of either or both of these

20 reports, the matter will be ready for judicial review.

21     **4.**      **The USDA Violated ESA When it Failed to Conduct the Requisite**
            **Analysis and/or Consultation Prior to Concluding that the 2005 Rule had**

22             **"No Effect" on Listed Species**

23          **a.**      **ESA Legal Standards**

24       The ESA contains both substantive and procedural provisions designed to protect

25 species listed as threatened or endangered under the Act. *See Forest Guardians v.*

26 *Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). Section 7(a)(2), the substantive provision of

27 the Act, requires federal agencies to "insure that any action, authorized, funded, or carried

28 out by [the] agency . . . is not likely to jeopardize the continued existence of any

endangered species or threatened species or result in the destruction or adverse

44

modification of habitat of such species. . . ."  16 U.S.C. § 1536(a)(2).  ESA defines

"action[s]" requiring consultation broadly to include "the promulgation of regulations," 50

C.F.R. § 402.02(b), and actions which "indirectly caus[e] modifications to the land, water, or

air."  50 C.F.R. § 402.02(d).

Section 7(b) then sets forth the process of consultation.  It requires that federal

agencies consult with the appropriate wildlife agency on every action that "may affect" a

threatened or endangered species.  50 C.F.R. § 402.14(a).  "May effect" has been

interpreted broadly to mean that "any possible effect, whether beneficial, benign, adverse,

or of an undetermined character," triggers the consultation requirement.  *See* 51 Fed. Reg.

19926, 19949 (June 3, 1986).  ESA regulations additionally define "effects" as:

> the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline.  The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.  *Indirect effects are those that are caused by the proposed action and are later in time, but are still reasonably certain to occur.*

50 C.F.R. § 402.02 (emphasis added).

The ESA generally envisions a three-step consultation process to ensure

compliance with the above requirement.  *See Forest Guardians*, 450 F.3d at 457.   First,

the agency contemplating action must request information from the appropriate federal

consulting agency, the Fish & Wildlife Service ("FWS") or the National Marine Fisheries

Service ("NMFS"), regarding "whether any species which is listed or proposed to be listed

may be present in the area of such proposed action."  *Id.* (citing 16 U.S.C. § 1536(c)(1));

s*ee also Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059,

1063 n.1 (9th Cir. 2004) (for ESA consultation on freshwater or land-based species, the

consulting agency is the FWS, but for marine or anadromous species, the consulting

agency is the NFMS) (citing 50 C.F.R. § 402.01).

If so, and if the action constitutes a "major construction activity," then the agency is

required to produce a "biological assessment" (or "BA") in accordance with ESA "for the

purpose of identifying any endangered species or threatened species which is likely to be affected by such action."  50 C.F.R. § 402.12; *see also* George C. Coggins & Robert L. Glicksman, Public Natural Resources Law, § 15C:11, *The Consultation Process - Biological Assessment* (2006 Suppl.).   "Major construction activity" is defined as "a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in [NEPA]." 50 C.F.R. § 402.02.  If the biological assessment concludes that there are no listed species or critical habitat present that are likely to be adversely affected, and the wildlife agency confers, then formal consultation is not required.  50 C.F.R. § 402.12(k)(1).  However, if the biological assessment concludes that listed species are in fact likely to be adversely affected, the agency then must ordinarily enter into formal consultation with the wildlife service.  *See Forest Guardians*, 450 F.3d at 457.

In cases in which the agency proposes "actions" that do not constitute "major construction activity," there is some question regarding an agency's obligation to prepare a BA prior to further consultation.  *See, e.g., Center for Food Safety v. Johanns*, 2006 WL 2927121 at * 4 (D. Hawaii Oct. 11, 2006) (currently on appeal before Ninth Circuit) (interpreting ESA and concluding that BAs are not required only for "major construction activity," but are required "any time FWS or NMFS concludes that endangered or threatened species 'may be present' in the area of the proposed agency action")*; see also Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985) (concluding, without discussion of whether action constitutes "major construction activity," that "[o]nce an agency is aware that an endangered species may be present in the area of its proposed action, the ESA requires it to prepare a biological assessment to determine whether the proposed action 'is likely to affect' the species").  However, there is no dispute that the agency is required to engage in some type of consultation - even if no BA is required - if the proposed action, while not a "major construction activity," "may affect" endangered or threatened species and their habitat.

Where a proposed action "may affect" endangered and threatened species, but the agency desires to avoid the lengthy and costly process of formal consultation, it may first

1     initiate informal consultation.  *See* 50 C.F.R. § 402.13.  Informal consultation, which

2     includes "all discussions, correspondence, etc., between the agency and the wildlife

3     service," may serve as a precursor to formal consultation.  *Id.*  However, if informal

4     consultation results in a finding of no effect, then the consultation process is terminated,

5     and no further action is required.  *Id.*  If informal consultation results in a finding, though,

6     that the action is likely to adversely affect listed species or habitat, then subsequent formal

7     consultation is required.

8         Formal consultation requires the wildlife agency to produce a "biological opinion" that

9     evaluates the nature and extent of the proposed action's effect on the listed species and

10    that, if necessary, "posits reasonable and prudent alternatives to the proposed action." *See*

11    50 C.F.R. § 404.14.

12         In reviewing alleged ESA violations, the court considers whether the agency acted in

13    an arbitrary and capricious manner.  *See Defenders of Wildlife v. EPA*, 420 F.3d 946, 959

14    (9th Cir. 2005).

15                  **b.**       **Parties' Arguments**

16         The parties agree that the USDA did not consult with expert agencies regarding the

17    2005 Rule's potential impact on threatened and endangered species.  Instead, the USDA

18    simply made a determination that the 2005 Rule would have "no effect" on listed species,

19    and that consultation was not required.

20         Plaintiffs argue that because the 2005 Rule may, at a minimum, indirectly impact

21    hundreds of listed species that depend on the National Forest System for their habitat, the

22    USDA was required to consult with expert agencies regarding the rule's potential impact.

23    They contend that the 2005 Rule may have an impact on listed species living in the national

24    forests because it not only alters the process for amending and revising forest plans, but

25    also eliminates or weakens substantive standards and protections for numerous forest

26    resources, including fish and wildlife species.  Plaintiffs specifically point to the potential

27    impact on lynx.  *See* Motion at 23 n.19.

28         Plaintiffs note that the Ninth Circuit, in *Pacific Rivers Council v. Thomas*, rejected the

Forest Service's previous attempts to avoid consultation under the ESA by simply labeling

1  an action as "programmatic."  30 F.3d 1050, 1055 (9th Cir. 1994).  Like with their NEPA

2  arguments, plaintiffs again rely on the Ninth Circuit's decision in *Citizens* for the proposition

3  that an impact in this case is "reasonably probable."  341 F.3d at 973.

4       Finally, plaintiffs argue that the court should not uphold defendants' "no effect"

5  determination because there are over 400 listed species in the NFS.  They assert that

6  courts generally uphold such "no effect" determinations only where there are no listed

7  species within the planning area.

8       In opposition, defendants counter that no ESA consultation was required because

9  any potential indirect effects of the 2005 Rule on listed species were remote and

10 indiscernible. They argue that plaintiffs' ESA claim fails for the same reasons as their NEPA

11 claims, and contend that plaintiffs have stretched "indirect effects" to an exercise of rank

12 speculation.  They argue that the 2005 Rule does not weaken the protections required by

13 ESA for the listed species, and in fact, requires that Forest Plans "provide appropriate

14 ecological conditions for specific threatened and endangered species." *See* 36 C.F.R. §

15 219.10(b)(2); 70 Fed. Reg. 1047.  Defendants further assert that later potential adverse

16 impacts on site-specific actions do not require consultation in this case.

17      Defendants also contend that plaintiffs have misinterpreted the meaning of "indirect

18 effects" as provided by ESA.  They assert that indirect effects may be caused by an action

19 later in time, but are nevertheless "still . . . reasonably certain to occur."  50 C.F.R. §

20 402.02; *see also* 50 C.F.R. § 402.14(g) & (h) (cited for the proposition that ESA formal

21 consultations need not consider the effects of "future . . . Federal activities").  They argue

22 that here, effects are not "reasonably certain" because the 2005 Rule does not dictate the

23 contents of a forest plan, but instead leaves it to each forest unit to determine the contents.

24 Moreover, defendants contend that ordinary principles of proximate causation such as

25 those set forth by the Supreme Court in *Babbitt v. Sweet Home Chapter,* should apply, and

26 that because there will need to be an intervening site-specific project before any adverse

27 impacts result from the 2005 Rule, there is insufficient causation.  515 U.S. 687, 697 n.9,

28 700 n.13, 708-14 (1995).

1    Plaintiffs reply by noting that the threshold for triggering consultation under ESA is

2  "exceedingly low" – even lower than the trigger for an EA or EIS under NEPA.  They attack

3  what they label as defendants' main arguments regarding the "no effect" determination.

4  First, plaintiffs note that defendants erroneously rely in large part on NEPA cases, which

5  plaintiffs assert has a higher threshold for triggering procedural protections than ESA.

6  Next, plaintiffs contend that defendants mistakenly rely on *Babbitt* for their "proximate

7  cause" arguments, when *Babbitt* addressed section 9 of the ESA - a different section than

8  that at issue here.  Plaintiffs note that section 7 of the ESA, applicable here, has a lower

9  standard for triggering consultation than section 9 at issue in *Babbitt.*

10    Plaintiffs reiterate and describe the direct and indirect effects that they claim the

11  2005 Rule will have.  These include: (1) weakening or eliminating several substantive

12  protections for listed species that had been in place; (2) eliminating general protections for

13  wildlife that directly and indirectly benefitted listed species and the species they depend on

14  for prey, including the selection and monitoring of the "management indicator species" and

15  the viable population requirements, *see* 36 C.F.R. § 219.19;[7] and (3) eliminating general

16  protections for habitat, including eliminating the previously enforceable limitations on the

17  size of clearcuts in various forests, *see* 36 C.F.R. § 219.27(d)(2).

18    Plaintiffs discuss the plight of grizzly bears as one example of an adverse impact of

19  the 2005 Rule.  Prior to the 2005 Rule, plaintiffs assert that certain mandatory enforceable

20  standards have been part of forest plans.  Those standards apparently included those

21  contained in the federal "Grizzly Bear Conservation Strategy," which was included in the

22  forest plans for the six national forests surrounding Yellowstone National Park.  *See* 70

23  Fed.Reg. 69854, 69876 (Nov. 17, 2005).[8]  Plaintiffs contend that under the 2005 Rule,

24  forest plans do not include the five grizzly bear strategy standards.  *See* 36 C.F.R. §

25

26  ───────────────

27    [7]Plaintiffs assert that eliminating the viable population requirement has particularly profound effects on listed species because the requirement ensured the protection of all populations of a species wherever they may be found in national forests, and their habitat,

28  regardless of whether the agency designated it a "critical habitat" for the species.

    [8]Plaintiffs assert that the grizzly bear strategy itself contained five standards for sustaining the grizzly population.

219.7(a)(2)(iii).  Instead, the standards are replaced by discretionary guidelines.  Therefore, plaintiffs assert that the Forest Service will no longer be able to guarantee the previously existing strategies and activities that prevent harm to grizzlies.[9]  In sum, plaintiffs argue that the most important decisions affecting fish and wildlife populations are made at a level above that at which site-specific decisions are made.

In reply, defendants reiterate many of their arguments made in their opening papers. They suggest that potential future impacts must be known at the time the federal action is proposed.  In other words, an "effect" will not trigger consultation if the potential future impact depends on other additional future federal projects.  Defendants again argue that there is insufficient proximate causation with respect to the 2005 Rule, since a subsequent site-specific project is necessary to bring about the adverse effects.  In other words, defendants argue that because the 2005 Rule is content-neutral, it cannot, on its own, have a sufficient independent effect.

As for the standards and guidelines that plaintiffs claim the 2005 Rule eliminated, defendants argue that the real comparison point is not the 1982 Rule, which plaintiffs have utilized, but the 2000 Rule, which was in effect and replaced by the 2005 Rule.  Defendants nevertheless acknowledge that plaintiffs may be correct that site-specific projects implementing Forest Plans under the 2005 Rule may affect grizzlies, woodpeckers, owls, lynx, and other listed species.  They argue, though, that this at most suggests that a consultation may be appropriate during later stages of plan implementation when there is a site-specific proposal.  Defendants then reassert that agencies need not engage in consultation where a listed species is present, but not affected by the proposed action.

### c.    Analysis

Similar issues exist with the ESA claim as with the NEPA claim, and the court's conclusions are therefore also similar.  Again, defendants' argument that consultation is

---

[9]Additionally, plaintiffs contend that the lynx will be affected by the 2005 Rule, noting that FWS placed the lynx on the threatened list where "the single factor threatening . . . lynx" is the "lack of guidance for conservation of lynx in [forest plan]."  65 Fed.Reg. 16052, 16082 (March 24, 2000).

1    triggered only by project-specific or groundbreaking activities is *not* nonsensical.  Quite to

2    the contrary.  The rationality of the argument has made the court's decision much more

3    difficult to reach.  However, an in-depth review of ESA authority reveals that, like with the

4    NEPA claim, defendants' position is not firmly supported by case law.

5          The Ninth Circuit has undeniably interpreted ESA to require consultation on

6    programmatic actions and rules,  including consultation at the planning stage, not just the

7    site-specific stage.  In *Pacific Rivers Council*, the Ninth Circuit rejected the very argument

8    proffered by defendants here –  that an agency was not required to consult under ESA until

9    a site-specific project or activity takes place.  30 F.3d at 1050.  In that case, the Forest

10   Service failed to consult with NMFS regarding the effects of certain LRMPs on the Snake

11   River salmon, a threatened species under ESA.  *Id.*  The FS argued in part that it was not

12   required to consult on the LRMPs, which were merely "programmatic" documents, and did

13   not mandate any specific activities themselves.  *Id.* at 1055.

14         The court rejected the argument, and noted that "there is little doubt that Congress

15   intended to enact a broad definition of agency action in the ESA."  *Id.* at 1054.  It concluded

16   that "[t]he LRMPs are comprehensive management plans governing a multitude of

17   individual projects," and that "every individual project planned in both national forests

18   involved in this case is implemented according to the LRMP."  *Id.* at 1053.   It held that the

19   LRMPs were agency "action" for which ESA consultation was required, finding that they

20   "'may affect' the protected salmon because the plans set forth criteria for harvesting

21   resources within the salmon's habitat."  *Id.* at 1055.  It further noted that the plans set

22   guidelines for logging, grazing, road-building activities, "the allowable sale quantity of timber

23   as well as production targets and schedules for forage, road construction, and other

24   economic commodities."  *Id.; see also Lane County Audubon Society v. Jamison*, 958 F.2d

25   290 (9th Cir. 1992) (new strategy and guidelines that set forth the criteria for selection of

26   land for logging, which constituted a four-phase plan to direct management of forest lands

27   over the years, required consultation under ESA even though it did not direct any project-

28   specific activity).

1    Understandably, as with NEPA, defendants' ESA arguments focus to a large degree

2    on the issue of *effect.*  They cite a number of cases regarding direct and indirect effects.

3    However, *none* of the cases defendants rely on are of a posture similar to this case.  In all

4    of the cases cited by defendants, there had either been a biological assessment or some

5    sort of consultation - formal or informal - undertaken.  The fact that some evaluation had

6    occurred enabled the courts to consider the effects of the action at issue.  Here, this court

7    is left with the same issue presented by the NEPA claim.  It is being asked to evaluate

8    effects in the first instance - in a case where the agency itself has not even undertaken a

9    biological assessment or informal consultation.

10    The parties have not cited, and this court was unable to find *any* Ninth Circuit cases

11    in which the court affirmed an agency's finding that there would be no effect on listed

12    species without the agency having engaged in some type of analysis in the form of a BA or

13    formal or informal consultation.  In *Southwest Center*, a case that defendants rely on in

14    support of the "no effect" determination here, the agency prepared a BA prior to making

15    that finding.  *See* 100 F.3d at 1443 (concluding that agency's determination that approval of

16    timber salvage sale would have no effect on owl following preparation of BA was not an

17    abuse of discretion).

18    In fact, in all of the cases that the court has found in which the agency determined

19    that ESA did not apply or that formal consultation was not necessary prior to conducting

20    *any* analysis or consultation, the Ninth Circuit has held that the agency abused its

21    discretion, and has emphasized the importance of complying with ESA procedural

22    requirements.  *See, e.g., Thomas,* 753 F.2d at 763-64 (Forest Service was required to

23    prepare a BA to determine the effects of construction of timber road and timber sales on

24    endangered Rocky Mountain Gray Wolf); *Washington Toxics Coalition v. EPA*, 413 F.3d

25    1024 (9th Cir. 2005) (EPA was required to consult under ESA regarding the registration of

26    54 pesticide active ingredients that may effect salmon and steelhead in the waters of the

27    Pacific Northwest); *Pacific Rivers Council*, 30 F.3d at 1050 (agency was required to consult

28    regarding the effects of LRMP on salmon); *Lane County*, 958 F.2d at 290 (BLM was

1    required to consult with FWS regarding the effect of land management guidelines on the

2    northern spotted owl).

3          In *Thomas*, one of the cases in which the agency did not prepare a BA, the Ninth

4    Circuit noted the significance of a procedural violation under ESA.  It held that:

5          Without a biological assessment, it cannot be determined whether the
       proposed project will result in a violation of the ESA's substantive provisions.
6       A failure to prepare a [BA] for a project in an area in which it has been
       determined that an endangered species may be present cannot be
7       considered a *de minimis* violation of the ESA.

8    753 F.2d at 763.  It further found that the Forest Service's own study of the effects of the

9    construction of a timber road and timber sales on the endangered Rocky Mountain Gray

10   Wolf, without preparation of a BA or consultation with the FWS, could "not constitute a

11   substitute for the preparation of the [BA] required by the ESA."  *Id.* at 764.  The *Thomas*

12   court also compared the ESA violation to a NEPA violation, noting that "[a] failure to

13   prepare a biological assessment is comparable to a failure to prepare an [EIS] under

14   NEPA]."  *Id.*  Given the "substantial procedural violation," it held that "the remedy must be

15   an injunction of the project pending compliance with ESA."  *Id.*

16         In this case, it does not appear that there is any dispute that there *are* indeed listed

17   species that are present in the area of the proposed action.  There is also no dispute that

18   the proposed action affects the entire NFS, in which over 400 species live.  The indirect

19   effects that plaintiffs have noted may result from the 2005 Rule include:  (1) weakening or

20   eliminating several substantive protections for listed species that had been in place; (2)

21   weakening or eliminating general protections for wildlife that directly and indirectly

22   benefitted listed species and the species they depend on for prey, including the selection

23   and monitoring of the "management indicator species" and the viable population

24   requirements; and (3) weakening or eliminating general protections for habitat.  Plaintiffs

25   have further pointed to specific species that may be affected by the rule.

26         The real issue with respect to the ESA claim concerns the degree of causation

27   and/or the certainty of the effects that may result from the 2005 Rule.  However, again, like

28   with the NEPA claim, the parties are putting the cart before the horse to the extent that they

urge the court to make any findings beyond one that the 2005 Rule "may effect" listed

1    species and habitat.  For the reasons discussed above with the NEPA claim, it is

2    impossible for the court to measure precisely the effects or the degree of causation

3    associated with the 2005 Rule without the benefit of any record typically associated with a

4    BA or consultation below, both which the USDA chose to forego.  *See Washington Toxics*

5    *Coalition*, 413 F.2d at 1035 ("[i]t is not the responsibility of the plaintiffs to prove nor the

6    function of the courts to judge, the effect of a proposed action on endangered species *when*

7    *proper procedures have not been followed*") (emphasis added) (citing *Thomas*, 753 F.2d at

8    765). This case is therefore factually distinct from the ESA cases relied on by defendants in

9    support of their argument regarding effect, because, as noted, in those cases, a BA or

10   some sort of consultation had already taken place.[1]  *See Southwest Ctr.*, 100 F.3d at 1447;

11   *see also American Rivers v. National Marine Fisheries Serv.*, 126 F.3d 1118, 1122 (9th Cir.

12   1997) (plaintiffs challenged conclusions in biological opinion issued following formal

13   consultation regarding effects of operation of Federal Columbia River Power System on

14   salmon).

15           The trigger here for initiation of the consultation process is not that the 2005 Rule

16   was *likely* to have adverse effects, but simply that the rule *may* effect listed species or

17   critical habitat.  As set forth above, plaintiffs have explained a number of potential indirect

18   effects presented by the 2005 Rule.  Again, as with the NEPA claim, the Ninth Circuit's

19   analysis and conclusion in the *Citizens* case that indirect effects were "reasonably

20   probable" to result from the 2000 Rule similarly supports this court's determination on the

21   ESA claim that the 2005 Rule may also indirectly effect listed species and their habitats.

22   *See* 341 F.3d at 975.

23

24

25   _____

26   [1]Defendants have also relied on a number of NEPA cases and on section 9 ESA cases, both of which are distinguishable from ESA section 7 cases, such as this one.  *See, e.g., Metropolitan Edison v. People Against Nuclear Energy*, 460 U.S. 766, 774, 776 (1983) (NEPA);

27   *Lujan,* 961 F.2d at 886 (NEPA only); *Babbitt*, 515 U.S. at 697 (ESA, section 9).  Additionally, *Ground Zero Center Non-Violent Action v. United States Dep't of the Navy*,  a case which

28   involved an ESA claim, is distinguishable because in that case, the Ninth Circuit held that the Navy lacked the discretion to cease the challenged action that threatened the endangered species.  383 F.3d 1082, 1092 (9th Cir. 2004).  Here, there is *no* dispute that the agency's action is discretionary.

1    In conclusion, because programmatic rules such as the 2005 Rule are covered by

2   ESA's procedural requirements, and because the 2005 Rule "may effect" listed species and

3   their habitats, the USDA erred in not initiating the consultation process.  Even if BAs are

4   limited to "major construction activity," which the 2005 Rule does not appear to be, the

5   agency was required to undertake some type of consultation, informal or otherwise, prior to

6   making a conclusive determination that there would be no effect.  Given the 2005 Rule's

7   potential *indirect* effects on listed species, combined with the USDA's lack of

8   documentation in support of their "no effect" determination, the failure to consult and/or

9   prepare any type of biological analysis in conjunction with the 2005 Rule was arbitrary and

10  capricious.

11        **5.      The 2005 Rule Should be Enjoined Pending the Agency's Compliance
                    with the APA, NEPA, and ESA**
12
           Having determined that plaintiffs are entitled to relief on the APA, NEPA, and ESA
13
      claims, the court turns to the issue of the appropriate relief or remedy.
14
                  **a.     Legal Standards**
15
           A district court has "broad latitude in fashioning equitable relief when necessary to
16
      remedy an established wrong."  *High Sierra Hikers*, 390 F.3d at 641 (citations omitted).
17
      The traditional bases for injunctive relief are irreparable injury and inadequacy of legal
18
      remedies.  *Id.*  In issuing an injunction, the court must balance the equities between the
19
      parties and give due regard to the public interest.  *Id.*  "Environmental injury, by its nature,
20
      can seldom be adequately remedied by money damages and is often permanent or at least
21
      of long duration, i.e., irreparable."  *Id.* (citing *Amoco Prod. Co. v. Village of Gambell*, 480
22
      U.S. 531, 542 (1987)).
23
           In the NEPA context, irreparable injury flows from the failure to evaluate the
24
      environmental impact of a major federal action.  *Id.* (citing *Thomas*, 753 F.2d at 764).
25
      While an injunction does not automatically issue upon a finding that an agency violated
26
      NEPA, "the presence of strong NEPA claims gives rise to more liberal standards for
27
      granting an injunction."  *Id.*  If environmental injury is sufficiently likely, the balance of harms
28
      will usually favor the issuance of an injunction to protect the environment.  *Id.*  The Ninth

1    Circuit has noted that where the government fails to comply with NEPA procedures, the

2    harm is one "to the *environment*, but the harm [also] consists of the *added risk* to the

3    environment that takes place when governmental decisionmakers make up their minds

4    without having before them an analysis (with prior public comment) of the likely effects of

5    their decision on the environment."  *National Parks & Conservation Ass'n v. Babbitt*, 241

6    F.3d 722, 737-38 n.18 (9th Cir. 2001) (following *Sierra Club v. Marsh*, 872 F.2d 497, 500

7    (1st Cir. 1989)).

8         As for ESA, the traditional test for preliminary injunctions is not the test for

9    injunctions under this act.  *National Wildlife Fed'n v. National Marine Fisheries*, 422 F.3d

10   782, 793-94 (9th Cir. 2005); *National Wildlife Fed'n v. Burlington Northern Railroad*, 23 F.3d

11   1508, 1510 (9th Cir. 1994).  In cases involving ESA, Congress removed from the courts

12   their traditional equitable discretion in injunction proceedings of balancing the parties'

13   competing interests.  *Id.*  "As the Supreme Court has noted, 'Congress has spoken in the

14   plainest of words, making it abundantly clear that the balance has been struck in favor of

15   affording endangered species the highest of priorities.'"  *Marine Fisheries*, 422 F.3d at 794

16   (citing *TVA v. Hill*, 437 U.S. 153 (1978)).  Therefore, "courts may not use equity's scales to

17   strike a different balance."  *Marine Fisheries*, 422 F.3d at 794 (citations omitted).

18        "Although not every statutory violation leads to the 'automatic' issuance of an

19   injunction, in the context of the ESA, the test for determining if equitable relief is appropriate

20   is whether an injunction is necessary to effectuate the congressional purpose behind the

21   statute."  *Id.* at 795.  The Ninth Circuit has repeatedly held that injunctive relief is necessary

22   to effectuate Congress' intent by requiring compliance with the substantive and procedural

23   provisions of ESA.  *See id.*

24            **b.    Parties' Arguments**

25        Plaintiffs argue that the court should set aside the 2005 Rule and the 2004

26   Interpretive Rule, and reinstate the 1982 Rule.  They contend that they are entitled to

27   injunctive relief on all of their claims.

28        Plaintiffs contend that defendants' actions have already caused irreparable harm,

     and threaten more harm by allowing site-specific projects to proceed that violate the 1982

1   Rule.  They argue that the court should reinstate the 1982 Rule because the NFMA

2   requires a comprehensive regulatory framework, like that of the 1982 Rule.  Plaintiffs assert

3   that the 1982 Rule was the one previously in force under the 2000 Rule's transition

4   provision.  They also ask the court to enjoin defendants from taking any action contrary to

5   the 1982 Rule.

6          In opposition, defendants argue that even if this court finds a violation under NEPA,

7   ESA, or the APA, it is not required to grant injunctive relief.  Instead, defendants contend

8   that a remand to the USDA without vacatur of the 2005 Rule is the appropriate remedy.

9   They assert that the 2005 Rule should be presumed to be substantively valid, and should

10  not be set aside while procedural defects are cured.

11         Defendants further contend that irreparable injury may not be presumed even if

12  there is a violation, and that plaintiffs must demonstrate an environmental injury of "long

13  duration" that is "sufficiently likely" to satisfy the irreparable injury prerequisite.  Without

14  much explanation, defendants assert that "[c]ontinued application of the neutral 2005 Rule

15  has no direct environmental impacts and certainly no irreversible impacts."  They assert

16  that the rule will have been in place for nearly two years at the time the court reaches the

17  merits.

18         Additionally, defendants argue that if this court finds a violation, the violative

19  provision should be severed from the rest of the 2005 Rule. They contend that the 2005

20  Rule could function without the specific provisions that plaintiffs challenge here.  Finally,

21  defendants argue that even if this court were to replace the 2005 Rule with a former rule, it

22  should not be the 1982 Rule because the 2000 Rule and its transition provision immediately

23  preceded the 2005 Rule.

24         In reply, plaintiffs argue that defendants misstate the Ninth Circuit standards for

25  injunctive relief in this case; and that contrary to defendants' position, irreparable injury

26  flows from a failure to evaluate the environmental impact of a major federal action, and that

27  an injunction is generally the appropriate relief.  *See High Sierra Hikers*, 390 F.3d at 642;

28  *Thomas*, 753 F.2d at 764.  Additionally, plaintiffs contend that defendants are wrong to

    assert that the court may leave the defective rule in place.  They assert that the Ninth

1   Circuit routinely sets aside such rules.  *See* Pl. Oppos/Reply Br. at 33 (citing long list of

2   cases in support).  Plaintiffs contend that the Ninth Circuit only leaves a procedurally

3   defective rule in place where the rule actually *protects* the environment.  *See Idaho Farm*

4   *Bureau*, 58 F.3d at 1405; *Western Oil & Gas Assn. v. EPA*, 633 F.2d 803, 613 (9th Cir.

5   1980).

6          Plaintiffs also argue that remand without vacatur is not appropriate, and that

7   severance is not possible because *none* of the 2005 Rule was ever analyzed under NEPA,

8   nor presented to expert agencies under ESA.   Additionally, plaintiffs assert that if a rule is

9   reinstated, it must be the 1982 Rule because the 2000 Rule and its transition provision

10  were never "in force."  Plaintiffs concede that certain forests or grasslands have begun

11  revising plans under the 2005 Rule, but note that defendants have been aware of potential

12  invalidation of the 2005 Rule since October 2004, and have therefore been acting at their

13  peril.  Plaintiffs further argue that because the Ninth Circuit ruled in *Citizens* that the 2000

14  Rule was promulgated illegally under NEPA, it cannot be reinstated.  *See Citizens*, 341

15  F.3d at 970.

16         In reply, in addition to reiterating arguments set forth above, defendants note that in

17  *Citizens,* the Ninth Circuit did not vacate the 2000 Rule, but instead remanded to the district

18  court to address the plaintiffs' motion for an injunction.  341 F.3d at 978. Accordingly, they

19  argue that the 2000 Rule has never been vacated.  Defendants also argue that reinstating

20  the 1982 Rule is beyond this court's authority, and that if the 2005 Rule is set aside, the

21  2000 Rule would be in effect by operation of law.

22              **c.    Analysis**

23         The court concludes that injunctive relief is required in light of the procedural

24  violations of the APA, NEPA, and ESA.  There is little question that injunctive relief is

25  appropriate on the ESA claim, given that the traditional test for injunctions does not apply,

26  and that the scales are generally tipped in favor of injunctive relief.  *See, e.g., National*

27  *Wildlife Fed'n*, 422 F.3d at 793-94.

28         The court also concludes that injunctive relief is appropriate with respect to the APA

and NEPA claims as well.  The irreparable harm in this case stems from the agency's

1  failure to follow the statutes' procedural mandates, which required it to undertake an

2  evaluation of the environmental impacts of the 2005 Rule, and also to open the rule up to

3  public notice and comment.  *See High Sierra Hikers*, 390 F.3d at 641; *Thomas*, 753 F.2d at

4  764.  Moreover, the court is required to consider the public's interest in formulating relief for

5  the NEPA violations.   *See High Sierra Hikers*, 390 F.3d at 641 (noting that public's interest

6  in "maintaining pristine wild areas unimpaired by man for future use and enjoyment"

7  weighed in favor of the equitable relief).  Because the harm in this case flows from the way

8  in which the entire 2005 Rule was enacted, severance cannot adequately redress it.

9       While plaintiffs' request to enjoin implementation of the 2005 Rule is being granted,

10  the court declines their invitation to reinstate the 1982 Rule.  First, it is not entirely clear to

11  the court whether the 1982 Rule has been superceded.  In the face of the injunction, it

12  would seem that the rule immediately preceding the 2005 Rule would control future agency

13  action.  Nevertheless, this is a determination for the USDA to make in the first instance.  By

14  this order, the court expresses no opinion on what rule the USDA should follow pending

15  final determination of the viability of the 2005 Rule.  Nor does the court intend to suggest

16  any particular conclusion for the environmental analysis.  That too is a determination for the

17  USDA.  Instead the court finds only that the USDA has not complied with the procedural

18  requirements of the statutes at issue and as a result the court cannot find that it need not

19  do so.

20                                      **CONCLUSION**

21       For the reasons set forth above, the court GRANTS IN PART AND DENIES IN

22  PART plaintiffs' motion for summary judgment and GRANTS IN PART AND DENIES IN

23  PART defendants' motion for summary judgment.  In sum, the court GRANTS plaintiffs'

24  motion for summary judgment and DENIES defendants' motion for summary judgment on

25  the APA, NEPA, and the ESA claims as they pertain to the 2005 Rule.  The court, however,

26  GRANTS defendants' motion for summary judgment and DENIES plaintiffs' motion for

27  summary judgment on the APA claim pertaining to the 2004 Interpretive Rule.

28       The matter is remanded to the USDA for compliance with the APA, ESA, and NEPA,

    as discussed above.  In particular, the agency must provide notice and comment on the

1    2005 Rule as required by the APA since the court concludes that the rule was not a "logical
2    outgrowth" of the 2002 Proposed Rule.  Additionally, because the 2005 Rule may
3    significantly affect the quality of the human environment under NEPA, and because it may
4    affect listed species and their habitat under ESA,  the agency must conduct further analysis
5    and evaluation of the impact of the 2005 Rule in accordance with those statutes.  The
6    USDA is ENJOINED from implementation and utilization of the 2005 Rule until it has fully
7    complied with the pertinent statutes.  As no other claims remain, judgment shall be entered
8    by separate document.  If any party wishes to file a request for a stay pending appeal, it
9    may do so in accordance with Federal Rule of Civil Procedure 62(c).

10

11   **IT IS SO ORDERED.**

12

13   Dated: March 30, 2007

14   _____
15                        PHYLLIS J. HAMILTON
                          United States District Judge

60